872 So.2d 1020 (2002)
STATE of Louisiana
v.
Joseph Michael CARMOUCHE.
No. 2001-KA-0405.
Supreme Court of Louisiana.
May 14, 2002.
Order Granting Rehearing and Remanding September 25, 2003.
*1024 G. Paul Marx, Lafayette, Counsel for Applicant.
Richard P. Ieyoub, Attorney General, Michael Harson, District Attorney, Kim R. Hayes, Crowley, Counsel for Respondent.
KIMBALL, J.
This is a direct appeal under article V, section 5(D)[1] of the Louisiana Constitution. The defendant, Michael Carmouche, was indicted by a grand jury for the first degree murders of Priscilla, Rhonada, and Keisha Guillory. Following a trial, a petit jury found the defendant guilty and recommended a sentence of death. The trial court sentenced the defendant to death in accordance with that recommendation. In his appeal to this court, the defendant raises fourteen separate assignments of error. After a thorough review, we conclude that none of the assignments or error raised by the defendant merit reversal, and we therefore affirm the defendant's conviction and sentence.

FACTS AND PROCEDURAL HISTORY
At 11:08 a.m. on May 3, 1997, officers of the Church Point Police Department received a call that there was a problem at 837 East Venable Street. Upon their arrival, the officers were met by Ms. Clement Guillory, who told them that there were three dead bodies inside the home. The officers entered the home and discovered the dead bodies of Priscilla Guillory and her two daughters, Rhonada (age 15) and Keisha Guillory (age two). Ms. Clement Guillory, who was Priscilla's mother, informed the officers that she had gone into the house and had used a blanket to cover the lower portion of Rhonada's body, which had been unclothed. The officers secured the scene and notified the Acadia Parish Sheriff's Office.
Deputies of the Acadia Parish Sheriff's Office arrived at the home, including Detective Keith Latiola. The deputies found Priscilla Guillory in her bed, Keisha at the *1025 foot of Priscilla's bed, and Rhonada on a sofa in a bedroom down the hall. All three victims had been shot multiple times.[2] Fifteen spent shotgun shells were retrieved from the crime scene, and no evidence indicated a forced entry into the home.
The victims' family members informed the deputies that the defendant was Priscilla's boyfriend and Rhonada and Keisha's father. They told the deputies that the defendant previously had been living at the same residence as the victims, but he was now living in the Opelousas area. Detective Latiola contacted the captain of the Opelousas Police Department and asked him to locate the defendant. The defendant was at the Opelousas Police Department when Detective Latiola arrived there later that day. Detective Latiola introduced himself to the defendant, informed him of his Miranda rights, and obtained a waiver of rights from him, but did not arrest him. During the interview, the defendant confirmed that Rhonada and Keisha were his daughters, and that he had been living at 837 East Venable Street for some time, but had moved out approximately four months ago, although he still visited periodically. Detective Latiola asked the defendant where he had been the previous night and morning, and the defendant replied that he had been alone at his residence. When the detective informed the defendant that his daughters and Priscilla were dead, the defendant showed no emotion. The defendant stated that he wanted to cooperate, and that he wanted to find out who killed them or clear himself. Detective Latiola then asked for the defendant's consent to search his residence. The defendant agreed and signed a voluntary search warrant.
Because the defendant's residence was located in St. Landry Parish, Detective Latiola went to the defendant's residence accompanied by a member of the St. Landry Parish Sheriff's Office, along with Captain Trahan of the Opelousas Police Department, Detective Rick Leger, and the defendant. In the bottom of the defendant's bedroom closet, Captain Trahan found six unfired shotgun shells, which were twelve gauge, Federal brand heavy field, one and one-eighth ounce, number eight shot. In a trash can in the defendant's kitchen area, Detective Leger found an empty pack of Best Value brand menthol light cigarettes, which appeared to have blood on it. Detective Latiola asked the defendant what he had been wearing the night before, and the defendant replied that he had been wearing the pair of jeans that was in his closet. Detective Latiola retrieved the jeans and also asked the defendant if he could have the pair of Dockers brand pants that the defendant was wearing at the time, and the defendant consented. Detective Latiola gave the above items to Lieutenant Melancon, who in turn transported them to the Acadiana Crime Lab.
The defendant voluntarily returned to the Opelousas Police Department; he was again informed of his rights and that he was not under arrest. Detective Latiola inquired about the shotgun shells, and the defendant said that his brother-in-law, Bradley Young, gave him the shells about one year ago. The detective asked if the defendant ever owned a shotgun, and the *1026 defendant responded that he had never owned and had never been loaned a shotgun. Upon further questioning, the defendant stated that, on the night of the murder, he twice called Priscilla's grandmother to inquire about Priscilla's whereabouts.[3] These two calls from the defendant's residence were later confirmed by telephone company records.
Detective Latiola testified that the murder weapon was never found, but he learned that the defendant's brother, Christopher Leo Carmouche, purchased a shotgun for the defendant from the Wal-Mart store in Opelousas on March 6, 1997. Chris Carmouche confirmed in his testimony that the defendant had contacted him and asked him to purchase a twelve gauge single barrel shotgun for hunting purposes, although Chris never knew the defendant to hunt. Chris stated that the defendant waited outside in the car while he went into Wal-Mart to buy the shotgun with the defendant's money. This purchase was also confirmed by a form signed by Chris Carmouche required by the Federal Bureau of Alcohol, Tobacco and Firearms for all firearm purchases. Chris also confirmed that, approximately two weeks after the purchase of the shotgun, the defendant contacted him again and asked him to purchase twelve gauge shotgun shells for him. The defendant again gave money to Chris who purchased the shells from Wal-Mart.
From the coroner's office, Detective Latiola obtained blood samples from the three victims and submitted them to Acadiana Crime lab. The items seized from the defendant's residence were subjected to DNA testing at Reliagene Technologies Lab. The DNA tests revealed microscopic high-velocity blood spatter of the victims. Upon receiving these DNA results, Detective Latiola contacted the district attorney's office, obtained arrest warrants for the defendant for the murders of Priscilla, Rhonada, and Keisha Guillory, and arrested the defendant.
On September 2, 1997, a grand jury indicted the defendant on three counts of first degree murder.[4] The defendant rejected an offer to plead guilty to three counts of second degree murder and serve three concurrent terms of life imprisonment. Thereafter, the state proceeded to trial against the defendant. Among the testimony given at trial was that of Arthur Young, a forensic chemist with Acadiana Crime Lab. Mr. Young testified that high-velocity blood spatter was found on the pack of cigarettes and the shotgun shells retrieved from the defendant's residence, and on the defendant's pants. He stated that high-velocity blood spatter can only be produced by a high amount of energy, such as that from a machine or an explosion. He also testified that the blood spatter in this case appeared to have been caused by a force of 100 feet or more per second being applied to a bloody object, and that a victim being shot by a firearm would produce such a result.
Chris Henderson, also a forensic chemist with Acadiana Crime Lab, testified that the six unspent shotgun shells found in the defendant's closet matched the fifteen spent shotgun shells found at the crime scene and the waddings retrieved from the *1027 victims' bodies. The shells were all Federal brand, twelve gauge, number eight shot. He further testified that these particular shells were manufactured exclusively for Wal-Mart as a promotional item. Based on the markings on the fifteen shells found at the crime scene, Mr. Henderson determined that they had all been fired from a single shot crack barrel shotgun.
Julie Golden, a forensic DNA analyst with Reliagene Technologies Lab, testified that the blood on the defendant's pants, on the shotgun shells, and on the pack of cigarettes was compared with the known samples of blood taken from the defendant and from each of the victims during autopsy. The blood on the defendant's pants matched the genetic profiles of Keisha and Rhonada Guillory. The blood on the shotgun shells and the pack of cigarettes matched the genetic profile of Priscilla Guillory. None of the blood on the items of evidence matched the defendant's genetic profile. Ms. Golden also testified that the likelihood of finding another match besides Rhonada and Keisha Guillory who could possibly have donated the blood spatter on the defendant's pants would require testing 485 million African American samples and more and one billion Caucasian or Hispanic samples. The likelihood of finding another match besides Priscilla Guillory who could possibly have donated the blood spatter on the shotgun shells and the pack of cigarettes would require testing 624 million African-American samples and more than one billion Caucasian or Hispanic samples. Ms. Golden testified to the strict protocols to which Reliagene adheres in conducting DNA analysis so that no contamination of the samples occurs, and counsel stipulated to the lab's accreditation.
The petit jury returned a unanimous verdict of guilty as charged. The petit jury determined that the defendant should receive the death penalty based on their finding of two aggravating circumstances, namely, that the defendant knowingly created a risk of death or great bodily harm to more than one person, and that one of the victims was under the age of twelve years. See La.C.Cr.P. art. 905.4(A)(4), (10). On June 16, 2000, defense counsel filed a motion for new trial, which the trial court denied after a hearing. Later that day, the trial court formally imposed the death sentence on the defendant.
The defendant then filed a direct appeal in this court, based on fourteen assignments of error.[5] The principal issues in this appeal involve: (1) whether the trial court should have granted the defense's challenge for cause regarding a particular prospective juror; (2) whether the trial court should have granted the defense's motion for a mistrial or to strike the entire venire due to a different prospective juror's mention of a "sanity test" taken by the defendant; (3) whether the trial court should have granted the defense's motion for a mistrial or to strike certain jurors who asked why the defendant was not wearing handcuffs; and (4) whether the trial court should have appointed a sanity commission during trial.

LAW AND ANALYSIS

Voir Dire Issues

Assignment of Error No. 2
In his second assignment of error, the defendant contends that the trial court erred in refusing to grant the defense's challenge for cause regarding prospective juror Larry Guidry. Our analysis *1028 begins with the Louisiana Constitution, which guarantees an accused the right to full voir dire examination of prospective jurors and the right to challenge jurors peremptorily. La. Const. art. I, § 17(A). The Constitution further states that the number of peremptory challenges shall be fixed by law. Id. In trials such as this one, where the offense is punishable by death or necessarily by imprisonment at hard labor, the law provides that "each defendant shall have twelve peremptory challenges, and the state twelve for each defendant." La.C.Cr.P. art. 799. It is well settled in Louisiana that prejudice is presumed when a defendant's challenge for cause is erroneously denied and the defendant exhausts all of his peremptory challenges. See, e.g., State v. Ball, 00-2277, p. 7 (La.1/25/02), 824 So.2d 1089, 1102; State v. Jacobs, 99-1659, p. 4 (La.6/29/01), 789 So.2d 1280, 1283; State v. Taylor, 99-1131, p. 6 (La.1/17/01), 781 So.2d 1205, 1213; State v. Anthony, 98-0406, p. 22 (La.4/11/00), 776 So.2d 376, 391; State v. Cross, 93-1189, p. 6 (La.6/30/95), 658 So.2d 683, 686; State v. Robertson, 92-2660, pp. 2-3 (La.1/4/94), 630 So.2d 1278, 1280-81. To prove there has been error warranting a reversal of the conviction and sentence, the defendant need only show (1) the erroneous denial of a challenge for cause; and (2) the use of all his peremptory challenges. Taylor at p. 6, 781 So.2d at 1213; Cross at p. 6, 658 So.2d at 686; State v. Maxie, 93-2158, p. 15 (La.4/10/95), 653 So.2d 526, 534; Robertson at p. 3, 630 So.2d at 1281. In this case, it is undisputed that the defendant used all of his peremptory challenges. Therefore, we must ascertain whether the trial court erred in denying the defendant's challenge for cause regarding prospective juror Larry Guidry. Taylor at pp. 6-7, 781 So.2d at 1213; Maxie at p. 15, 653 So.2d at 534; Robertson at p. 3, 630 So.2d at 1281. If the court erred in denying this cause challenge, then the defendant's constitutional and statutory right to twelve peremptory challenges has been violated, prejudice is presumed, and there is reversible error requiring reversal of the convictions and sentence. See La.C.Cr.P. art. 921; see also Ball at p. 7, 824 So.2d at 1099 (stating that "[a]n erroneous ruling depriving an accused of a peremptory challenge violated his substantial rights and constitutes reversible error."); Jacobs at p. 5, 789 So.2d at 1284; Anthony at p. 22, 776 So.2d at 391; Robertson at p. 3, 630 So.2d at 1281 & n. 4; State v. Ross, 623 So.2d 643, 644 (La.1993).
The grounds on which a juror may be challenged for cause are set forth in Louisiana Code of Criminal Procedure article 797.[6] In this case, the defense focuses on two of these grounds, namely, that Mr. Guidry was not impartial and that he would not accept the law as given to him by the court. La.C.Cr.P. art. 797(2), (4). The defense argues that Mr. Guidry *1029 was predisposed to automatically impose the death penalty, that he could not apply mitigation because no one has the "right" to do what the defendant did, that he stated the only penalty he would consider for killing two children was death, and that he said it was "in [his] head" the that defendant committed the murders.
As this court has repeatedly stated, a trial court is vested with broad discretion in ruling on challenges for cause, and the ruling of trial court judge will be reversed only when a review of the entire voir dire reveals the judge abused his discretion. See, e.g., State v. Ball, 00-2277, p. 7 (La.1/25/02), 824 So.2d 1089, 1099; State v. Jacobs, 99-1659, p. 5 (La.6/29/01), 789 So.2d 1280, 1284; State v. Frank, 99-0553, p. 18 (La.4/16/01), 803 So.2d 1, 18; State v. Anthony, 98-0406, p. 22 (La.4/11/00), 776 So.2d 376, 391; State v. Wessinger, 98-1234, p. 9 (La.5/28/99), 736 So.2d 162, 174 (statutorily superceded in part by La. C.Cr.P. art. 905.2(A) regarding who may give victim impact testimony); State v. Williams, 96-1023, p. 6 (La.1/21/98), 708 So.2d 703, 711; Cross at p. 7, 658 So.2d at 686; Robertson at p. 4, 630 So.2d at 1281; Ross, 623 So.2d at 644; State v. Knighton, 436 So.2d 1141, 1148 (La.1983). Although the trial judge has broad discretion, a challenge for cause should nevertheless be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render judgment according to law may be reasonably implied. Ball at p. 7, 824 So.2d at 1099; Robertson at p. 4, 630 So.2d at 1281; State v. Hallal, 557 So.2d 1388, 1389-90 (La.1990) and cases cited therein. The proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 851-52 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581, 589) (internal quotations omitted)); see also State v. Sullivan, 596 So.2d 177, 186 (La.1992), rev'd on other grounds sub nom. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The United States Supreme Court held in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) that a prospective juror who would vote automatically for a life sentence was properly excluded by the trial court. In what is known as a "reverse-Witherspoon" context, the basis of the exclusion is that a prospective juror will not consider a life sentence and will automatically vote for the death penalty under the factual circumstances of the case before him. Ball at p. 7, 824 So.2d at 1099; Taylor at p. 7, 781 So.2d at 1214; State v. Divers, 94-0756, pp. 7-8 (La.9/5/96), 681 So.2d 320, 324. The "substantial impairment" standard enunciated in Witt was applied to a reverse-Witherspoon challenge by the United States Supreme Court in Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), and by this court in several cases, including Ball, Taylor, Ross, and State v. Duncan, 99-2615 (La.10/16/01), 802 So.2d 533. The Morgan Court held that venire members who would automatically vote for the death penalty must be excluded for cause. Morgan, 504 U.S. at 729, 112 S.Ct. at 2229-30, 119 L.Ed.2d at 502-03; see also Taylor at p. 8, 781 So.2d at 1214; Divers at p. 8, 681 So.2d at 324 n. 5. The Court reasoned that any prospective juror automatically voting for death would fail to consider the evidence of aggravating and mitigating circumstances, thus violating the impartiality requirement embodied in the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *1030 Id. This court has also held that a juror whose responses on the whole indicate that she cannot consider both a life sentence and a death sentence is not impartial and will not accept the law as given to her by the court. See Maxie at pp. 16, 23, 653 So.2d at 534-35, 537-38; see also Ball at p. 7, 824 So.2d at 1099. In other words, if a prospective juror's views on the death penalty are such that they would prevent or substantially impair the performance of their duties in accordance with their instruction or their oaths, whether those views are for or against the death penalty, the prospective juror should be excused for cause. Ball at p. 7, 824 So.2d at 1099 (quoting Taylor at p. 8, 781 So.2d at 1214); Divers at p. 8, 681 So.2d at 324 n. 5.
Upon examining the voir dire transcript in this case, we find that as a whole Larry Guidry's responses were more balanced than the defendant claims. Mr. Guidry introduced himself as thirty years old, married with three children (ages six, five, and five and a half months), and residing in Crowley. He graduated high school, and he and his wife work at a bag factory, Interstate Polymer, where he is the manager. Initially, Mr. Guidry sought an employment hardship excuse from serving, stating that he had been told by the factory's human resources manager that "there's no one that can take my place for... like a week or two." The court denied Mr. Guidry's request, assuring him that his employment could not be terminated due to his jury duty. Mr. Guidry later indicated in open court that he had heard something about the case, the court and the parties queried him in chambers:
BY THE COURT: ... Mr. Guidry, in open court you indicated that you had heard something about this case?
BY MR. GUIDRY: Yeah. Well, I have aI work with a few different people that's from Church Point, and when it happened I had heard some stuff about it.
BY THE COURT: Exactly what did you hear? ...
BY MR. GUIDRY: Well, I just heard that some guy had killed his wife and then killed his two (2) kids, and one of the kidsthe older was mentallyspecial ed or whatever.
BY THE COURT: And you got that by word of mouth or
BY MR. GUIDRY: Yes. They're all from Church Point, and theyI mean when it happened, just talking in the office about it.
BY THE COURT: Have you formed an opinion one way or the other not having heard the evidence in this
BY MR. GUIDRY: No.
BY THE COURT: Pardon?
BY MR. GUIDRY: I mean, it's in my head, but I mean, I hadn't seen the evidence.
BY THE COURT: It's in your head. What's in your head?
BY MR. GUIDRY: That he killed his kids and his wife.
BY THE COURT: When you say he, you're talking about the defendant?
BY MR. GUIDRY: Yes.
The court then gave the attorneys an opportunity to question Mr. Guidry.
BY MR. HAYES (prosecutor): Do you think that just because he's arrested that he's guilty?
BY MR. GUIDRY: No, sir.
BY MR. HAYES: Could you withhold judgment and listen to all the evidence?
BY MR. GUIDRY: Yes.
BY MR. HAYES: I guess the biggest question is can you start this trial off with a clean slate and not hold anything against him by presuming he's guilty until you hear the evidence?

*1031 BY MR. GUIDRY: Yes, I have to do that.
BY MR. HAYES: You can do that?
BY MR. GUIDRY: Yes.
BY MR. HAYES: So you're saying that, and I'm trying to mesh that with what you told the [j]udge earlier. I mean, I know you heard things
BY MR. GUIDRY: Right.
BY MR. HAYES:but are you telling us today that you could put aside what you heard and all this?
BY MR. GUIDRY: Yeah, I think I could.
BY MR. HAYES: You know that someone has to be proven guilty in a [c]ourt of law, not rumors, but actual evidence?
BY MR. GUIDRY: Right.
BY MR. HAYES: And you can do that?
BY MR. GUIDRY: Sure.
BY THE COURT: Ms. Thomas?
BY MS. THOMAS (defense counsel):
Mr. Guidry, this thing that's in your head that Michael
BY MR. GUIDRY: It's just a rumor, but
BY MS. THOMAS: Well, that's it. It's based on rumors, right?
BY MR. GUIDRY:a lot of rumors are true. Right.
BY MS. THOMAS: Well, as you say, a lot [of] rumors are true.
BY MR. GUIDRY: Right.
BY MS. THOMAS: now, if we were in, you know,let's pretend. The trial's over. You've heard all the evidence, and y'all are in there deliberating. And there's something that you know heard, one of these rumors. It could be true.... But you didn't get it from evidence.... Are you going to supply that little fact from your rumors?
BY MR. GUIDRY: No. They wasn't there, you know. I mean, it's just hearsay.
The trial court concluded this discourse with Mr. Guidry by asking whether, if he were the defendant, he would want someone like himself on the jury. Mr. Guidry responded affirmatively and said that he thinks he is fair. During the Witherspoon questioning, Mr. Guidry told the prosecutor that he could consider both life and death sentences. Defense counsel asked Mr. Guidry if seeing the crime scene photos would cause him to become so inflamed that he would want to punish someone, and therefore would vote to sentence the defendant to death. Mr. Guidry responded that seeing the photos would not change his decision, although he would not enjoy seeing them too much. He confirmed that he understood the state's burden was to prove all of the elements of first degree murder beyond a reasonable doubt, and that he could hold the state to that burden. Defense counsel then gave a thorough explanation of mitigating circumstances and the juror's responsibility to consider them in the penalty phase. During the discussion on mitigation, defense counsel asked Mr. Guidry if he could consider favorably the fact that someone had no prior criminal record, to which Mr. Guidry responded:
BY MR. GUIDRY: Not a serious offense like this. I don't think I could.
BY MS. THOMAS: Okay. What would you think would be a mitigating factor in a serious offense like this? Can't think of anything that you think that would mitigate against the death penalty in a serious offense like this where you have three (3) dead persons and one of them this two (2) year old?
BY MR. GUIDRY: I could maybe consider life in prison.
...
BY MS. THOMAS: ... These are the statutory mitigating circumstances.... No significant prior history of criminal *1032 activity, while the offender was under the influence of extreme mental or emotion disturbance. Would you think that would be something that you would consider in making that seriousnoyou could believe that any
BY MR. GUIDRY: I don't think that gives anyone a right to kill three (3) people.
Defense counsel continued to explain and give examples of the various statutory mitigating factors after which Mr. Guidry commented:
BY MR. GUIDRY: I'm sorry, but I don't think anything you can tell me canthat he had the right to do that or someone had the right to do it. I don't think I would haveif I did that to my kids I would want to be punished, and maybe I'm wrong for thinking like that but that's what [is] in my head.
BY MS. THOMAS: No, you[`re] not wrong. You[`re] certainly entitled. Everybody has their individual attitudes and opinions and we all respect them.... But if I understand you correctly, that under the circumstances of this particular crime where you have three (3) dead people, two (2) of them are children, that the only appropriate penalty would be the death penalty?
BY MR. GUIDRY: Yes, ma'am.
Defense counsel went on to repeatedly remind the panel of jurors that even if they found absolutely no mitigating factors present in the case, they still did not have to vote for the death penalty. The court then asked Mr. Guidry:
BY THE COURT: If you sat on this jury and if this defendant was found guilty of first degree murder, just because he's found guilty do you think heand if you don't believe he should die would you vote for the death penalty?
BY MR. GUIDRY: No, sir.
BY THE COURT: Okay, only if you think the circumstances are such that the death penalty is warranted would you vote for it?
BY MR. GUIDRY: Right.
BY THE COURT: And if you don't think it[']s worthit[']s merited then you won't vote for it?
BY MR. GUIDRY: No, sir.
BY THE COURT: So you consider all circumstances, both good, bad and
BY MR. GUIDRY: Right.
BY THE COURT: Okay. Thank you sir.
Thereafter, defense counsel challenged Mr. Guidry for cause, but the judge denied the challenge, stating that he "got a good understanding of what [Mr. Guidry] means." The defense then exercised a peremptory challenge to excuse Mr. Guidry.
The defense contends that Mr. Guidry was not impartial because it was in his head that the defendant committed the murders. We note that the record states it was in Mr. Guidry's head that "some guy" had killed his wife and two kids, but does not state that he believed the defendant was the perpetrator. The record also reflects that Mr. Guidry was mindful that this talk came from persons who had no personal knowledge of the case, that he had not seen evidence, and that he would withhold judgment until he had seen all the evidence. Mr. Guidry repeatedly made it clear that the rumors would not affect his ability to decide the case based on only the evidence, that he would hold the state to its burden, and that he would not let the rumors interfere with deliberations. We therefore disagree with the defendant's conclusion that Mr. Guidry was impartial on this basis.
The defense also argues that Mr. Guidry could not apply mitigation because of his belief that no one has the "right" to do what the defendant did, and that death is *1033 the only appropriate penalty for killing three people, two of whom are children. Previously, this court reversed convictions where a juror's comments, viewed in the context of the entire voir dire record, revealed that his mind was set on imposing the death penalty. See State v. Divers, 94-0756 (La.9/5/96), 681 So.2d 320; State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526; State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278; State v. Ross, 623 So.2d 643 (La.1993). In the instant case, however, a reading of the entire voir dire reveals that Mr. Guidry's mind was not set on the death penalty. Mr. Guidry seemingly interpreted "mitigating factors" to mean justification for the murders, which he as a father disagreed with. Defense counsel was thereby able to elicit from Mr. Guidry something akin to an "automatic death" response under the particular circumstances of this case. We recognize that Mr. Guidry's indication that death is the only appropriate penalty where the defendant kills three people, two of whom are children, is similar to that in Robertson, where the juror indicated that death is the only appropriate penalty for double murder. In Robertson, however, the juror repeatedly made it clear that he would automatically vote to impose the death penalty in a case of double murder regardless of any mitigating evidence, and the juror was never sufficiently rehabilitated. See Robertson at pp. 4-8, 630 So.2d at 1281-84. In this case, the court's questioning of Mr. Guidry reveals Mr. Guidry's impartial position that, even if the defendant were found guilty, he would not vote for the death penalty if he did not believe it was merited. Mr. Guidry clarified his position that he would consider the good and bad circumstances in deciding whether to vote for the death penalty or life imprisonment. The court expressed that it had a good understanding of what Mr. Guidry meant, and we agree. As we explained in State v. Lucky, 96-1687, pp. 7-8 (La.4/13/99), 755 So.2d 845, 851:
When the trial judge throughout the voir dire demonstrates an awareness of the proper legal standard, and when there is nothing in the record of the voir dire that, taken as a whole, shows a substantial impairment of the prospective juror, a reviewing court should defer to the trial judge's determination with respect to challenges for cause. While the reviewing court must carefully review the record of voir dire for abuses of discretion, it need not and should not attempt to reconstruct the voir dire by a microscopic dissection of the transcript in search of magic words or phrases that automatically signify either qualification or disqualification.
The trial judge's broad discretion is necessary because the judge has the benefit of seeing the facial expressions and hearing the vocal intonations of the members of the jury venire as they respond to questioning by the attorneys. State v. Lee, 93-2810, p. 9 (La.5/23/94), 637 So.2d 102, 108. Such expressions and intonations are not readily apparent at the appellate level where review is based on a cold record. Id. In the instant case, our review of the record leads us to conclude that the trial court did not abuse its discretion in denying the defense's challenge for cause regarding Larry Guidry.

Assignment of Error No. 6
The defendant's sixth assignment of error concerns the denial of his motion for a mistrial and his motion to strike the entire venire based on a prospective juror's mention of a "sanity test" taken by the defendant. The defendant asserts that, during the selection process, defendant's psychiatric examination was disclosed to and tainted the venire. The incident to which the defendant refers occurred during questioning of a panel of twenty random veniremen, *1034 including Melanie Hearod Broussard. When the twenty panelists were still seated together in the courtroom jury box, the judge asked if there was any reason why any of the panelists felt they were not qualified to serve, or if they had any basis for impartiality. At that point, the following exchange took place:
BY MS. BROUSSARD: I don't know if this applies, but I know someone that works in the doctor's office that was that typed up a report that was done whenever the sanity test was given, and I've heard her talk about it.
BY MS. THOMAS: Your Honor, I think we need to
BY THE COURT: All right, hold on a minute. Yes, approach the bench, please.
The court then took a recess and met with the attorneys in the jury deliberation room outside of the presence of the venire. Defense counsel moved for a mistrial on the basis that Ms. Broussard let everyone in the venire know that the defendant had undergone a psychiatric examination. The trial court denied the motion, reasoning that nothing had been revealed beyond Ms. Broussard's knowledge of someone who had typed up a sanity report.
In a later discussion held in chambers with Mr. New, another prospective juror in the same panel, Mr. New disclosed that Ms. Broussard's statement affected him:
BY MR. NEW: Based on the testimony ofI believe it's juror number 17, her statement
BY MR. HAYES: Yes, sir, is it Ms. Broussard you're referring to?
BY M[R]. NEW: She was sitting down in the front. Number seventeen (17) in the front. She said she knew somebody that had plead insanity that he was that's what I had understood. Based on that I pretty much made a decision.
BY MR. HAYES: Without hearing any evidence?
BY MR. NEW: I heard the evidence.
BY MR. HAYES: You heard what evidence?
BY MR. NEW: That's what I
BY MR. HAYES: She felt about insanityshe didn't say about any plea. You just assumed that was a plea?
BY MR. NEW: Yes.
BY MR. HAYES: And because the word sanity was mentioned or there was a report you assume the defendant's guilty?
BY MR. NEW: Yes.
BY MR. HAYES: You cannot afford him his presumption of innocence at this point?
BY MR. NEW: It would be difficult.
BY MR. HAYES: How difficult?
BY MR. NEW: I don't buy the insanity.
BY MR. HAYES: And there is no insanity defense in this case, but are you telling me that the scales are still completely equal or are they tipped?
...
BY MR. NEW: I would sideI would side closer to the State.
Thereafter, the court excused Mr. New for cause.
In the same conference in chambers, one more juror, Mr. O'Brien, acknowledged to the prosecutor that he heard Ms. Broussard's remark. Mr. O'Brien stated that he had not spoken to Mr. New about the remark and that Ms. Broussard's mention of a sanity report would not, in itself, affect his opinion in any way as to the defendant's guilt or innocence. He then explained that his experience with crime victims as an anesthetist might affect his opinion, as well as his feeling that, because the defendant was arrested, there is a probability that the defendant is guilty. When questioned by defense counsel, Mr. O'Brien replied that he thought the defendant was probably guilty, upon which the court excused Mr. O'Brien for cause.
*1035 Defense counsel then moved to strike the entire venire, stating that "this was a remark that was heard, ... [and] has greatly affected at least two (2) of these jurors who were honest enough to tell us about it. We don't know what other taint is out there, so I don't think we can take that chance." The court denied the motion, noting that there is no insanity plea in the case, and it is therefore irrelevant.
We begin our analysis of this assignment of error by noting that Louisiana Code of Criminal Procedure article 419(A) states:
A general venire, grand jury venire, or petit jury venire shall not be set aside for any reason unless fraud has been practiced, some great wrong committed that would work irreparable injury to the defendant, or unless persons were systematically excluded from the venires solely upon the basis of race.
The defendant bears the burden of proving the grounds for setting aside the venire. State v. Wessinger, 98-1234, p. 5 (La.5/28/99), 736 So.2d 162, 171 (statutorily superceded in part by La.C.Cr.P. art. 905.2(A) regarding who may give victim impact testimony); State v. Lee, 559 So.2d 1310, 1313 (La.1990). In addition, La.C.Cr.P. art. 775 states in part that a defendant's motion for mistrial shall be ordered "when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial." The "prejudicial conduct" may include remarks of veniremen during voir dire. See generally State v. Sanders, 93-0001, pp. 20-21 (La.11/30/94), 648 So.2d 1272, 1288-89. However, mistrial is a drastic remedy that is warranted only when the defendant has suffered substantial prejudice such that he cannot receive a fair trial. Wessinger at p. 24, 736 So.2d at 183; State v. Bates, 495 So.2d 1262, 1273 (La.1986); State v. Wingo, 457 So.2d 1159, 1166 (La. 1984). A trial court need not order a new trial absent a showing that comments made by a prospective juror affected other jurors or prejudiced the defendant. State v. Cushenberry, 407 So.2d 700, 701-02 (La. 1981); State v. Hutto, 349 So.2d 318, 320 (La.1977). The determination of whether actual prejudice has occurred lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion. Wessinger at p. 24, 736 So.2d at 183; Sanders at p. 21, 648 So.2d at 1288. In deciding the correctness of the trial court's voir dire rulings, a reviewing court considers the entirety of the voir dire record. State v. Hall, 616 So.2d 664, 668-69 (La. 1993).
In the instant case, as soon as Ms. Broussard made the comment about a sanity report, defense counsel objected and cut off any further remarks, and the court immediately halted voir dire. The comment was made during the second panel of twenty prospective jurors, and therefore nearly the entire venire remained for counsel to explore any source of prejudice the prospective jurors may have had, including anything they may have heard in the courtroom. The record shows that all parties thoroughly examined each prospective juror. Two prospective jurors, Mr. New and Mr. O'Brien, admitted they heard the comment and the court excused both of them for cause, even though Mr. O'Brien's partiality appears to have stemmed from his work as an anesthetist and his presumption regarding arrested persons, rather than his hearing about the sanity report. Even assuming that the entire venire heard the Ms. Broussard's comment, it would not necessarily have prejudiced the defendant or caused him irreparable injury because two of the listed mitigating factors that the jury may consider during the penalty phase are (1) that the offense was committed while the offender was under the influence of extreme *1036 mental or emotional disturbance, and (2) that the offender could not appreciate the criminality of his conduct or conform his conduct to the requirements of the law because he was impaired by a mental disease or defect. La.C.Cr.P. art. 905.5(b), (e). The defense did in fact call Dr. Larry J. Benoit, a psychologist, as a witness during the penalty phase of the trial, and Dr. Benoit gave testimony regarding psychological and intellectual tests he performed on the defendant. The trial court twice considered the effect of Ms. Broussard's comment on the other prospective jurors and twice concluded that there was no prejudice. It is our conclusion that there was no abuse of the trial judge's discretion is apparent from his decision to deny counsel's motions to strike the venire and for mistrial under these circumstances, and that this assignment of error does not warrant relief.

Assignment of Error No. 7
In his seventh assignment of error, the defendant argues that the trial court erred in denying his motion for a mistrial[7] and to strike certain jurors who expressed concern about the defendant not wearing handcuffs. In the defendant's view, the prospective jurors' opinions that the defendant should be shackled represents a preconceived notion of the defendant's guilt and a belief in the nature of his character such that they could not be fair and impartial.
The trial court began the third day of voir dire by speaking with the prospective jurors individually in the jury deliberation room. The following discussion took place between the court and juror Carla Bergeaux:
BY THE COURT: ... Ms. Bergeaux over ... the last three (3) days during the voir diring of the jury, you understand or you understood the Court's instruction that you all were not to discuss any aspect of this case?
BY MS. BERGEAUX: Yes, sir.
BY THE COURT: ... Have you discussed... any aspect of this case with any of your fellow jurors?

*1037 BY MS. BERGEAUX: Like for instance?
BY THE COURT: Well anything. Anything about this case.
BY MS. BERGEAUX: No. But I'm just wondering about one (1) thing.
BY THE COURT: All right. What is that ma'am.
BY MS. BERGEAUX: Why Mr. Carmouche isn't in handcuffs?
BY THE COURT: All right. And ... why [do] you have that concern?
BY MS. BERGEAUX: Because for anyyou know anytime a defendant is brought in to Court for a murder trial and especially for
BY THE COURT: All right. Ma'am the law does not ... allow us to handcuff anyone in a jury trial and that's the reason that he's not in handcuffs. Does that create a problem for you? ...
BY MS. BERGEAUX: Oh, no, sir.
BY THE COURT: Does that create a presumption one way or the other for you that the
BY MS. BERGEAUX: No.
BY THE COURT: It doesn't. Okay. Is your concern that of security, ma'am?
...
BY MS. BERGEAUX: Yes, sir.
BY THE COURT: Okay. Well then you got the deputy sheriffI mean you're secured. We are all secured. Okay. You're sure that doesn't create a presumption one way or the other? ...
BY MS. BERGEAUX: No.
The prosecutor then asked Ms. Bergeaux two questions, after which defense counsel explored Ms. Bergeaux's concerns:
BY MS. THOMAS: Ms. Bergeaux, your concern is for security and your concern is that Michael isn't shackled, is that because you consider him dangerous or potentially dangerous?
BY MS. BERGEAUX: No. It's just because it[']sit[']sI justbecause it's a murder trial. I just assumed any defendant is handcuffed.
BY MS. THOMAS: You assumed that. I mean you didn't see that on television or some of the other jurors didn't mention it to you?
BY MS. BERGEAUX: No. That was my first observation when I came into the courtroom.
BY MS. THOMAS: And have any of your other jurors expressed this same concern to you? ...
BY MS. BERGEAUX: Yes, ma'am.
BY MS. THOMAS: They have. Could you tell us if you recall which of the other jurors have discussed this with you or mentioned it or expressed this same concern[?]
BY MS. BERGEAUX: It was Claire.
BY THE COURT: Yeah, Ms. KidderClaire Kidder.
...
BY MS. THOMAS: And had anyone else expressed this?
BY MS. BERGEAUX: I don't believe.
Thereafter, defense counsel argued to the court that jurors who felt the accused was dangerous enough to need handcuffs could not believe in the presumption of innocence or fairly and impartially judge the defendant. The court then interviewed another selected juror, Ms. Lasage, to ascertain whether she had discussed the case with Ms. Kidder or anyone else, and the court was satisfied that Ms. Lasage had not. Once Ms. Lasage had left the room, defense counsel urged the judge to probe the panelists specifically on whether they had discussed the handcuffs issue, but the judge felt that those involved in the discussion had been determined:
BY THE COURT: Ms. Thomas, with regard to Ms. Bergeaux. I asked her if they had discussed any aspect of [the] case and she said "no" with the exception *1038 of the shackles, she and Ms. Kidder. And I don't want to taint the other jurors by posing the question "did you talk about shackles?" No, I think they understand. I think those two were the ones who discussed the security question of the shackles. I just don't want to run the risk of tainting the others.
The court then interviewed individually the five remaining previously-selected jurors, none of whom indicated that they had discussed any aspect of the case with Ms. Kidder or Ms. Bergeaux. The court concluded, "Apparently it was just those two." Defense counsel pressed her position with the court, but the court denied the motion to strike Ms. Kidder and Ms. Bergeaux for cause.[8]
Ordinarily, a defendant should not be shackled, handcuffed or garbed in any manner destructive of the presumption of his innocence and of the dignity and impartiality of judicial proceedings. State v. Stephens, 412 So.2d 1057, 1059 (La. 1982); State v. Williams, 410 So.2d 217, 220 (La.1982); State v. Wilkerson, 403 So.2d 652, 659 (La.1981). Yet exceptional circumstances may require, within the discretion of the trial court, the restraint of the prisoner for reasons of courtroom security or order or where the prisoner's past conduct reasonably justifies apprehension that he may attempt to escape. Williams, 410 So.2d at 220; Wilkerson, 403 So.2d at 659. Additionally, as we discussed above, mistrial is a drastic remedy that is warranted only when the defendant has suffered substantial prejudice such that he cannot receive a fair trial. Wessinger at p. 24, 736 So.2d at 183; State v. Bates, 495 So.2d 1262, 1273 (La.1986); State v. Wingo, 457 So.2d 1159, 1166 (La. 1984).
In Stephens, Williams, and Wilkerson, the defendants had been shackled at some point, and the issue was whether a juror's seeing this had prejudiced the defendant. The facts of the instant case present the reverse situation. In the instant case, the general rule was followed and no juror or prospective juror ever observed the defendant in shackles at any time. However, this adherence to the general rule apparently left some of the prospective jurors wondering why the defendant was not handcuffed. The trial court carefully interviewed the persons known to have wondered about this and questioned them thoroughly on any source of bias that could cause them to be partial. The court concluded that the basis of their wonder was not related to the defendant's presumption of innocence, but rather to their misunderstanding of standard procedure that is followed "anytime a defendant is brought in to [c]ourt for a murder trial." After reviewing the record, we detected no prejudice resulting from Ms. Kidder and Ms. Bergeaux's musings, which were evidently among only themselves. Accordingly, we conclude that this assignment of error lacks merit.

Guilt Phase Issues

Assignment of Error No. 1
In assignment of error number one, the defendant contends that the trial court failed to appoint a sanity commission as required by the Louisiana Code of Civil Procedure when, during trial, defense counsel raised the issue of the defendant's capacity to proceed. Although the defendant's assignment concerns an alleged error during trial, it is important that we set forth the following background facts.
*1039 A grand jury indicted the defendant on September 2, 1997. On January 20, 1998, the state applied for the appointment of a sanity commission. That same day, the trial court appointed a sanity commission consisting of Robert L. McManus, M.D., a family practice physician, and Larry J. Benoit, who holds a Ph.D. in clinical psychology. Doctors McManus and Benoit each rendered a report reflecting that they evaluated the defendant pursuant to the criteria this court announced in State v. Bennett, 345 So.2d 1129, 1138 (La.1977) (on rehearing). In Bennett, we explained that the decision regarding a defendant's competency to stand trial should not turn solely upon whether he suffers from a mental disease or defect, but must be made with specific reference to the nature of the charge, the complexity of the case, and the gravity of the decision with which the defendant is faced. We stated that the appropriate considerations in determining whether the defendant is fully aware of the nature of the proceedings include:
whether he understands the nature of the charge and can appreciate its seriousness; whether he understands what defenses are available; whether he can distinguish a guilty plea from a not guilty plea and understand the consequences of each; whether he has an awareness of his legal rights; and whether he understands the range of possible verdicts and the consequences of conviction.
Bennett, 345 So.2d at 1138. We further stated that the facts to consider in determining the defendant's ability to assist in his defense include:
whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.
Id. The reports of Dr. McManus and Dr. Benoit show that they made the above inquiries and answered them in the affirmative. Both doctors testified at a sanity hearing held on May 4, 1998. At the conclusion of the hearing, the court found that the defendant was competent to stand trial and was sane at the time of the offense.
The event to which the defendant directs our attention in this assignment of error occurred at trial on June 3, 2000. The minutes reflect that jury selection was completed at 11:53 a.m. and the court then broke for lunch. At 2:55 p.m., defense counsel suggested that the defendant was not competent to proceed with trial in the following discussion:
BY THE COURT: All right good evening ladies and gentlemen. I understand there is a motion to be made by the defense in this matter before we continue with this trial, Ms. Thomas.
BY MS. THOMAS: That's correct, Your Honor. Based on ... recent discussions we have had with Mr. Carmouche we have reached the inescapable conclusion that Mr. Carmouche is not competent to proceed. Therefore we have raised this issue to the Coroner, and asked the Coroner to have him immediately examined again by a psychiatrist. We understand that the Court has taken care of this and that will be done this afternoon, so that we could have some definitive answer on whether or not we are correct in our fears.

*1040 BY THE COURT: You realize, Ms. Thomas, that a sanity commission was previously appointed and made its report and/or finding in this case.
BY MS. THOMAS: Yes, Your Honor and
BY THE COURT: And Mr. Carmouche was found to be competent.
BY MR. HAYES: Thank you, Judge.
BY MS. THOMAS: Yes, Your Honor, we are aware of that, but we fear that perhapsthat sanity commission examined Mr. Carmouche in 1998 that theand we have spoken to Mr. Carmouche in his very recent past, but it is our thought and, of course, we're not experts in this field, that perhaps it has been the strain of actually going to trial that has caused his condition to deteriorate and we do, in fact doubt his competency to proceed at this time.
BY THE COURT: Well, he's shaking his head. I don't know. Mr. Carmouche, this is for the record.
BY MR. CARMOUCHE: Judge, may I say something?
BY THE COURT: Well, if your lawyerunless your lawyer objects.
BY MR. CARMOUCHE: I amI feel sane. I'm cool, calm and collected.
BY THE COURT: I'm sorry?
BY MR. CARMOUCHE: I feel sane, and I am cool, calm, and collected. And I have been declared competent by you, and I'm ready to proceed with this trial.
BY THE COURT: Realize the law is that they mustMr. Hayes that they must proveit's the burden that rests with the defendant and they make that and they urgeI have already appointed Dr. Rees out of an abundance of caution, given the seriousness of this charge. Dr. Rees will be here ... between four (4:00) and four thirty (4:30) this afternoon to examine you again to make sure. And I'm going to allow that rather than proceed with the trial again because of the seriousness of this charge.
...
BY MS. THOMAS: Your Honor, may I just ask the Court that the recent jail records would show that Mr. Carmouche has been under a suicide watch for the past several days, and the reasons for that and also that the originalthe report of the original sanity commission be made available also to Dr. Rees....
BY MR. HAYES: Judge, by the State, just so that there's no wrong inference made on the record, defense counsel and myself, Mr. Nickel and myself spoke, and that was done out of an abundance of caution. And I would not like any inferences to be made just because we agreed to do that, that it meant anything toward his mental condition.
BY THE COURT: You agree to do what? Place him under suicide watch?
BY MR. HAYES: Yes. Correct, Your Honor.
BY THE COURT: ... Is that correct, Mr. Nickel?
BY MR. NICKEL: That's correct, Your Honor.
BY THE COURT: All right. Well what we're going to do then is recess until tomorrow morning.... Can you bring the jury in, Mr. Hayes?
BY MR. HAYES: Yes, Your Honor.
BY THE COURT: Ms. Thomas?
BY MS. THOMAS: Yes, sir.
BY MR. HAYES: We just have to be extremely careful, and I know Your Honor will be, but they don't know anything about this.
BY THE COURT: I'm going to bring them in here to let them know we're going to recess until tomorrow morning.
...
All right. Good evening ladies and gentlemen. We are going to recess until *1041 tomorrow morning at ten o'clock (10:00), and we will resume at ten (10:00) tomorrow morning.... Remove the jury please.
David J. Rees, M.D., a psychiatrist, stated in his report that he examined the defendant in the Acadia Parish Sheriff's Annex building between 4:15 p.m. until 6:00 p.m. that afternoon. Dr. Rees's report reflects that he evaluated the defendant pursuant to Bennett criteria, answering the inquiries in the affirmative. The following morning, the court announced Dr. Rees's findings to the parties and filed the report into the record, with no challenge by defense counsel. Based on the report, the court found that the defendant was competent to proceed.
A criminal defendant has a constitutional right not to be tried while legally incompetent. Medina v. California, 505 U.S. 437, 449, 112 S.Ct. 2572, 2579, 120 L.Ed.2d 353, 365-66 (1992) (quoting Drope v. Missouri, 420 U.S. 162, 173, 95 S.Ct. 896, 904, 43 L.Ed.2d 103, 114 (1975)). A state must observe procedures adequate to protect a defendant's right not to be tried while incompetent, and its failure to do so deprives the defendant of his due process right to a fair trial. Id. (quoting Drope, 420 U.S. at 172, 95 S.Ct. at 904, 43 L.Ed.2d at 113); Pate v. Robinson, 383 U.S. 375, 385, 86 S.Ct. 836, 842, 15 L.Ed.2d 815, 822 (1966). In his dissent in Medina, Justice Blackmun expressed his opinion that due process does not simply forbid the state to try to convict a person who is incompetent, but it also "demands adequate anticipatory, protective procedures to minimize the risk that an incompetent person will be convicted." Medina, 505 U.S. at 458, 112 S.Ct. at 2584, 120 L.Ed.2d at 371 (1992) (Blackmun, J. dissenting) (emphasis in original); see also State v. Martin, 00-0489, p. 1 (La.9/22/00), 769 So.2d 1168, 1169 (per curiam); State v. Nomey, 613 So.2d 157, 161 (La.1993).
Louisiana's statutory scheme for detecting mental incapacity jealously guards a defendant's right to a fair trial. Nomey, 613 So.2d at 161 (quoting State v. Rogers, 419 So.2d 840, 843 (La.1982)); see also Pate, 383 U.S. at 386, 86 S.Ct. at 842, 15 L.Ed.2d 815, 822 (stating that "Illinois jealously guards this right"). In Louisiana, "[m]ental incapacity to proceed exists when, as a result of mental disease or defect, a defendant presently lacks the capacity to understand the proceedings against him or to assist in his defense." La.C.Cr.P. art. 641; see also Nomey, 613 So.2d at 161. Our law also imposes a legal presumption that a defendant is sane and competent to proceed. La. R.S. 15:432[9]; State v. Bridgewater, 00-1529, p. 6 (La.1/15/02), 823 So.2d 877, 888; Martin at p. 1, 769 So.2d at 1169; State v. Armstrong, 94-2950, p. 4 (La.4/8/96), 671 So.2d 307, 309; State v. Silman, 95-0154, p. 7 (La.11/27/95), 663 So.2d 27, 32. Accordingly, the defendant has the burden of proving by a preponderance of the evidence his incapacity to stand trial. State v. Frank, 96-1136, p. 1 (La.10/4/96), 679 So.2d 1365, 1366 (citing Cooper v. Oklahoma, 517 U.S. 348, 116 S.Ct. 1373, 134 L.Ed.2d 498 (1996)); Armstrong at p. 4, 671 So.2d at 309; Silman at p. 7, 663 So.2d at 32. A reviewing court owes the trial court's determinations as to the defendant's competency great weight, and the trial court's ruling thereon will not be disturbed on appeal absent a clear abuse of discretion. Bridgewater at p. 6, 823 So.2d at 888; Martin at p. 1, 769 So.2d at 1169. Specifically, *1042 the appointment of a sanity commission is not a perfunctory matter, a ministerial duty of the trial court, or a matter of right. Martin at p. 1, 769 So.2d at 1169; State v. Nix, 327 So.2d 301, 323 (La.1975). It is not guaranteed to every defendant in every case, but is one of those matters committed to the sound discretion of the court. Martin at p. 1, 769 So.2d at 1169; Wilkerson, 403 So.2d at 658; Nix, 327 So.2d at 323. The Louisiana Code of Criminal Procedure provides that a court shall order a mental examination of a defendant and accordingly appoint a sanity commission when it "has reasonable ground to doubt the defendant's mental capacity to proceed." La.C.Cr.P. art. 643. Reasonable ground in this context refers to information which, objectively considered, should reasonably raise a doubt about the defendant's competency and alert the court to the possibility that the defendant can neither understand the proceedings, appreciate the proceedings' significance, nor rationally aid his attorney in his defense. State v. Snyder, 98-1078, p. 24 (La.4/14/99), 750 So.2d 832, 851 (quoting Lokos v. Capps, 625 F.2d 1258, 1261 (5th Cir.1980)). In the exercise of its discretion, the court may consider both lay and expert testimony before deciding whether reasonable grounds exist for doubting the defendant's capacity to proceed and ruling on the defendant's motion to appoint a sanity commission. Martin at p. 2, 769 So.2d at 1169; Silman at p. 7, 663 So.2d at 32.
In this case, when defense counsel suggested that the defendant was not competent to proceed with trial, the court prudently halted the proceedings and, out of an abundance of caution, appointed a psychiatrist to examine the defendant. The court's actions comport with the spirit of La.C.Cr.P. art. 642 which states that, when a question is raised as to the defendant's mental incapacity to proceed, "there shall be no further steps in the criminal prosecution, except the institution of prosecution, until the defendant is found to have the mental capacity to proceed." See also Nomey, 613 So.2d at 161-62. The court had a psychiatrist examine the defendant in order to aid the court in determining whether reasonable grounds to doubt the defendant's mental capacity to proceed existed. If the court had determined that reasonable grounds did exist, then the next step would have been to appoint a sanity commission. However, the court concluded to the contrary, and we find no error in that conclusion. It is notable that defense counsel merely requested that the defendant be evaluated by a psychiatrist, but did not move expressly for the appointment of a sanity commission under La.C.Cr.P. art. 644(A). Contrary to the defendant's contention, a trial court's preliminary inquiry of this nature does not constitute the unilateral conducting of a sanity hearing. See Martin at pp. 3-4, 769 So.2d at 1170.
Furthermore, the defendant's own statement to the court that he was sane and wished to proceed with trial directly contradicted the concomitant allegations of defense counsel. We recognize that it is doubtful whether a defendant can waive the defense of his competence to stand trial because "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently `waive' his right to have the court determine his capacity to stand trial." Pate, 383 U.S. at 384, 86 S.Ct. at 841, 15 L.Ed.2d at 821 (quoted by Snyder at p. 24, 750 So.2d at 850). Nevertheless, it remains that the trial court alone has the ultimate decision on the defendant's competence, and that decision is committed to the court's discretion. La.C.Cr.P. art. 647. Dr. Rees indicated to the court, as had Dr. McManus and Dr. Benoit before him, that the defendant was capable of proceeding to *1043 trial. On the showing made, we find that the trial court did not abuse its discretion in determining that the defendant was competent to stand trial, and that this assignment of error lacks merit.

CAPITAL SENTENCE REVIEW
This court must review every sentence of death imposed by Louisiana courts to determine if it is constitutionally excessive. La.C.Cr.P. art. 905.9;[10] La.S.Ct.R. 28.[11] In making this determination, we determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
La.S.Ct.R. 28 § 1. In the instant case, the district judge filed the Uniform Capital Sentence Report required by La.S.Ct.R. 28 § 3(a), and the Department of Public Safety and Correction submitted a Capital Sentence Investigation Report (CSIR) required by La.S.Ct.R. 28 § 3(b). In addition, the state filed a Capital Sentence Review Memorandum. These documents indicate that the defendant is an African American male born on November 9, 1956 to the marital union of Lillian Carmouche and Joseph Lee Carmouche. The defendant was forty years old at the time of the instant homicides. His father died seven years before the instant trial, but his mother testified on his behalf at the penalty phase. His mother informed the court that the defendant was one of thirteen children, eleven of whom were still living at the time of the defendant's trial. The defendant, who lived in Opelousas, never married but had an ongoing relationship with one of the victims, Priscilla Guillory. This relationship resulted in the birth of two children, the victims Rhonada and Keisha Guillory.
The defendant attended high school through the tenth grade, having repeated the third and fifth grades. Dr. Larry J. Benoit evaluated the defendant's IQ and determined that it was in the borderline range of 70-80. The defendant did not assert insanity as a defense, but his mental state did comprise part of the defense case in mitigation, in which Dr. Benoit testified that the defendant's intelligence range was close to mild mental retardation.
The defendant's work history was sporadic. Approximately twenty years before the instant offense, he was employed by Baton Rouge Labor Union doing maintenance work. At some point, he began employment with Waste Management, but he left that job in November of 1987. The defendant did odd jobs after that time.
The defendant had no juvenile criminal record. His adult criminal history began in 1974 when he pled guilty to carrying a concealed weapon (a knife) in Opelousas City Court, and was fined. The following year, he was arrested for simple assault and battery, but the district attorney dismissed the charges. In August of 1976, the defendant pled guilty to simple battery in Opelousas City Court and was fined. In February of 1977, he again pled guilty to *1044 simple battery in Opelousas City Court and was sentenced to twenty-five days in the parish jail and was placed on one year of unsupervised probation. In December of 1978, the defendant was convicted of aggravated battery and sentenced to five years imprisonment at hard labor, which the court suspended and placed the defendant on five years of active probation. The defendant's probation was revoked in May of 1983. In September of 1978, the defendant was arrested and charged with disturbing the peace and simple burglary, but the victim of the burglary charge refused to prosecute and the district attorney dropped the disturbing the peace charge. In November and December of 1978, the defendant was arrested for theft and aggravated battery, respectively, but no disposition could be found as to these offenses. In September of 1981, the defendant was arrested and charged with attempted second degree murder. Thereafter, in June of 1982, the defendant was charged with a separate count of simple battery. In April of 1984, the defendant entered a plea agreement and pled guilty to aggravated battery. He was sentenced to five years imprisonment at hard labor. In August of 1997, the defendant was charged by bill of indictment with the instant offenses, three counts of first degree murder.
At the penalty phase, the state reintroduced the testimony and evidence from the guilt phase and rested. The defendant did not testify at either the guilt phase or the penalty phase. The defense presented the following eight witnesses in the penalty phase: an expert on pardons, Dr. Benoit from the sanity commission,[12] two deputies who stated that the defendant had thus far been a model prisoner, the defendant's mother, aunt, brother, and sister, all of whom expressed a desire that the defendant receive a life sentence.

Passion, Prejudice, and Other Arbitrary Factors
Acadia Parish consists of relatively small communities. Therefore, many members of the venire, especially those from the victims' hometown of Church Point, had at least heard of the murders. Very few members of the venire indicated that they had prejudged the defendant as to guilt or innocence, and those who expressed such belief were excused for cause.
Race was not a factor in the proceedings. The defendant and all three victims were African-American. According to the trial judge's Uniform Capital Sentence Report, no members of the defendant's race were represented in his jury. However, the judge noted that there was no evidence of systematic exclusion of African Americans from the jury. Moreover, the entire transcript of voir dire contains no challenges under Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and no errors were assigned complaining about the composition of the defendant's jury. Although appellate counsel did not assign as error trial counsel's failure to invoke the Batson rule during voir dire as a possible claim of ineffective assistance of counsel, the instant record does not provide enough information to evaluate the merits of such a claim. It is impossible for us to ascertain how many, if any, of the state's peremptory challenges were exercised to remove African Americans from the jury because the instant record is silent as to the race of the members of the venire. We find that any possible allegation on this issue is *1045 better reserved for post-conviction review. State v. Burkhalter, 428 So.2d 449 (La. 1983).
At trial, defense counsel objected and moved that the entire panel, as selected, and the venire be excused after jurors apparently discussed matters amongst themselves, including why the defendant was not handcuffed. We have addressed these allegations and found them not to have prejudiced the defendant. See discussions on assignment of error number seven, supra, and assignment of error number five in the unpublished appendix. For the above reasons, we find that no arbitrary factor was interjected in these instances.

Aggravating Circumstances
The state relied on two aggravating circumstances, namely, that the offender knowingly created a risk of death or great bodily harm to more than one person, and that a victim was under the age of twelve years.[13]See La.C.Cr.P. art. 905.4(A)(4), (10); see also Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The jury returned a verdict of death, agreeing that both were supported by the evidence. As we conclude in our discussion of assignment of error number thirteen in the appendix to this opinion, the aggravating circumstances relied upon by the state were fully supported by the evidence. Consequently, the defendant's sentence of death is firmly grounded on the finding of these two aggravating circumstances.

Proportionality Review
The federal Constitution does not require proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Yet comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Ball, 00-2277, p. 23 (La.1/25/02), 824 So.2d 1089, 1110; State v. Irish, 00-2086, p. 8 (La.1/15/02), 807 So.2d 208, 216; State v. Jacobs, 99-0991, p. 19 (La.5/15/01), 803 So.2d 933, 956; State v. Duncan, 99-2615, p. 38 (La.10/16/01), 802 So.2d 533, 558; State v. Deruise, 98-0541, p. 37 (La.4/3/01), 802 So.2d 1224, 1249; State v. Deal, 00-0434, p. 16 (La.11/29/01), 802 So.2d 1254, 1267; State v. Neal, 00-0674, pp. 16-17 (La.6/29/01), 796 So.2d 649, 661. This court has set aside only one imposition of the death penalty as disproportionately excessive under the post 1976 statutes, finding in that one case, inter alia, a sufficiently "large number of persuasive mitigating factors." State v. Sonnier, 380 So.2d 1, 9 (La.1979); see also State v. Weiland, 505 So.2d 702, 707-10 (La.1987) (reversing on grounds of the trial court's erroneous exclusion of crucial mitigating evidence at both the guilt and penalty phases, but additionally finding that "the penalty imposed here appears disproportionate to that imposed in similar cases.").
This court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. Ball at p. 23, 824 So.2d at 1110; Irish at p. 8, 807 So.2d at 216; *1046 Jacobs at p. 19, 803 So.2d at 956; Duncan at p. 38, 802 So.2d at 559; Deruise at p. 37, 802 So.2d at 1249; Deal at p. 16, 802 So.2d at 1267; Neal at p. 16, 796 So.2d at 662; Sonnier, 380 So.2d at 7.
The state's Sentence Review Memorandum reveals that, since 1976, five cases have originated as first degree murder charges in Acadia Parish, including the defendant's case. Of those, juries have recommended the imposition of the death penalty in two, including the instant case.
The first case is that of Howard Thibodeaux, who fatally shot the victim after quarreling in a barroom on January 20, 1979. The jury found the defendant guilty of first degree murder, and sentenced the defendant to life imprisonment. This court affirmed the conviction and sentence in a per curiam decision. State v. Thibodeaux, 383 So.2d 1264 (La.1980) (per curiam).
The second case is that of John Fuller, who shot his mother-in-law in her bed during an aggravated burglary of her home. We affirmed Fuller's first degree murder conviction, but during the capital sentence review, pretermitted on the issue of excessiveness of the death sentence. We remanded the case to the trial court for an evidentiary hearing on the effectiveness of counsel, who put on little or no defense in the penalty phase. See State v. Fuller, 454 So.2d 119 (La.1984). On remand, the death sentence was set aside and the defendant was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence.
The third case is that of Leeroy John "Chubby" Broussard, who was charged with first degree murder after brutally slaying his fifteen-year-old wife by beating her in the head with a pipe wrench on February 28, 1987 during a melee between the defendant and other members of his wife's family. The jury returned the verdict of guilty of second degree murder, and the defendant was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence. See State v. Broussard, 560 So.2d 694 (La.App. 3 Cir.1990).
The fourth case is that of Calvin Brown, who was charged with two counts of first degree murder after he shot his girlfriend in the back of the head, and then threw their six-month-old son in the bayou where he apparently drowned, although the baby's remains were never found. On February 15, 1997, the jury returned a verdict of guilty as charged on both counts. However, the jury was unable to reach a decision in the penalty phase, whereupon the judge sentenced Brown on each count to life in prison without benefit of probation, parole, or suspension of sentence. On appeal, the third circuit reversed the defendant's conviction and vacated the sentence based on the trial court's error in denying a defense challenge for cause regarding a prospective juror who at the time was employed as a deputy sheriff. State v. Brown, 97-1531, p. 3 (La.App. 3 Cir. 6/10/98), 715 So.2d 566, 569. The case was remanded for a new trial. Id. On the day of the re-trial, the defendant pled guilty to two counts of manslaughter and was sentenced to consecutive terms of forty years imprisonment at hard labor.
Fifth is the instant case. On May 3, 1997, Joseph Michael Carmouche killed his ex-girlfriend and their two daughters, ages fifteen and two, by shooting them multiple times with a shotgun during the night in their home. After finding the defendant guilty as charged on all three counts, the jury determined that the defendant should be sentenced to death.
This brief review confirms that capital cases are a rarity in Acadia Parish. Even with this limited number of cases, the only other jury to return a death verdict was in Fuller, where the *1047 perpetrator shot a family member in her own home. The same situation is present in the instant case. Given the scarcity of comparable cases in Acadia Parish, it is appropriate for this court to look beyond the judicial district in which the sentence was imposed and to conduct the proportionality review on a state-wide basis. Duncan at p. 38, 802 So.2d at 559; Deal at 17, 802 So.2d at 1268; State v. Howard, 98-0064, p. 36 (La.4/23/99), 751 So.2d 783, 820; State v. Letulier, 97-1360, p. 27 (La.7/8/98), 750 So.2d 784, 800; State v. Thibodeaux, 98-1673, p. 31 (La.9/8/99), 750 So.2d 916, 939; State v. Ortiz, 96-1609, p. 23 (La.10/21/97), 701 So.2d 922, 936; State v. Connolly, 96-1680, p. 19 (La.7/1/97), 700 So.2d 810, 823; State v. Davis, 92-1623, pp. 34-35 (La.5/23/94), 637 So.2d 1012, 1030-31.
A state-wide review of cases reflects that jurors find the death penalty appropriate in cases in which the victim is a young child.[14] The majority of these offenses involved the commission of another enumerated felony, unlike the instant case where the additional aggravating *1048 factor was that the offender knowingly created a risk of death to more than one person. See La.C.Cr.P. art. 905.4(A)(4). In addition, a statewide review reflects that this court has affirmed capital sentences in a variety of case involving multiple deaths or when a defendant creates a risk of death or great bodily harm to more than one person.[15] Compared with these cases, we conclude that the sentence of death was not disproportionate in the instant case.

DECREE
For the reasons assigned herein, the defendant's conviction and death sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.C.Cr.P. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La.R.S. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant *1049 to its authority under La.R.S. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed in the state courts.
AFFIRMED.

ON REHEARING
PER CURIAM.
Application for rehearing granted; case remanded. For the first time in this Court, relator has raised the question of whether he is exempt from capital punishment by reason of mental retardation. See Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 2244, 153 L.Ed.2d 335 (2002). Because the issue is a matter for the district court in the first instance, and because "not everyone faced with a death penalty sentence will automatically be entitled to a post-Atkins hearing," State ex rel. Edwards, 02-0514 (La.3/21/03), 841 So.2d 768, quoting State v. Williams, 01-1650, p. 27 (La.11/1/02), 831 So.2d 835, 857 (implementing Atkins), it is not appropriate for this Court to address the merits at this time or to order an evidentiary hearing on the claim. On remand of this case, the district court is to consider pleadings from relator and from the state and determine whether relator has "provided objective factors that ... put at issue the fact of mental retardation." Williams, 01-1650 at 27, 831 So.2d at 857. If relator carries his burden in that regard, and if the court finds reasonable grounds to believe that relator is mentally retarded, it shall hold a hearing at which the court will take testimony and other evidence and determine whether relator is mentally retarded and so may not be executed. Id., 01-1650 at 29-32, 851 So.2d at 858-60.
If the court concludes that relator is not mentally retarded, and thus not exempt from capital punishment, it must vacate its previous order summarily denying his pro forma "shell" application and provide counsel with a reasonable opportunity to prepare and litigate expeditiously an application for post-conviction relief on relator's other claims. State v. Hampton, 00-2523 (La.8/31/01), 795 So.2d 1198.
NOTES
[1] La. Const. art. V, § 5(D) states:

In addition to other appeals provided by this constitution, a case shall be appealable to the supreme court if ... the defendant has been convicted of a capital offense and a penalty of death actually has been imposed.
[2] The coroner, Dr. Terry Welke, performed autopsies on the three victims. He testified that the cause of Keisha Guillory's death was three shotgun wounds to her body, fired from two to three feet away. He testified that Keisha had two additional shotgun wounds where pellets had grazed her body. The cause of Rhonada Guillory's death was two shotgun wounds to her head, fired from about two feet away. He stated that the cause of Priscilla Guillory's death was multiple shotgun wounds, and that Priscilla had been shot eight times.
[3] Priscilla Guillory did not have a phone at her residence, and the defendant therefore contacted her and the children by calling Priscilla's grandmother.
[4] La. R.S. 14:30 states that first degree murder includes the killing of a human being:

(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person; or
...
(5) When the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is under the age of twelve or sixty-five years of age or older.
[5] The assignments of error not discussed in this opinion do not constitute reversible error and are governed by well-settled principles of law. Those assignments are reviewed in an unpublished appendix that will comprise a part of the official record in this case.
[6] La.C.Cr.P. art. 797 states:

The state or the defendant may challenge a juror for cause on the ground that:
(1) The juror lacks a qualification required by law;
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court; or
(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense.
[7] The record reflects that the defendant moved to strike prospective jurors Claire Kidder and Clara Bergeaux on this issue, but it does not reflect that the defendant moved for a mistrial on this issue. However, the clerk's minutes from trial reveal that the defendant moved to release the entire empaneled jury on this issue and that the court denied the motion:

10:05 AM... Defense presents the Court with oral motion to release entire empaneled jury on the grounds of contamination of the presumption of innocence of the defendant based on a question by juror # 191 (Clara Kidder) as to the shackling and restraints for the defendant. State objects. The Court denied the Defense motion. Defense requests time to call the Third Circuit Court of Appeals for immediate relief. Denied by Court.
10:15 AMIn ante-chamber the remaining empaneled jurors are brought in one at a time and questioned by the Court and counsels as to discussion of this case amongst themselves. Court finds no cause to strike the entire panel and denies the defense motion.
Although the defense's motion to release the entire empaneled jury appears in the minutes, it does not appear in the record. It is possible that the court reporter did not record defense counsel's motion to release the entire empaneled jury. It is also possible that the court reporter failed to record defense counsel's oral motion for mistrial. However, when there is a discrepancy between the trial court minutes and the transcript, the transcript must prevail. State ex rel. Harris v. State, 96-0237, p. 1 (La.2/16/96), 667 So.2d 1042, 1042; State v. Lynch, 441 So.2d 732, 734 (La.1983). Nevertheless, even if defense counsel did move timely for a mistrial and moved to release entire panel of jurors already chosen, we conclude in our analysis of this assignment of error that the private discussion between prospective jurors Bergeaux and Kidder regarding handcuffs did not so prejudice the defendant to make it impossible for him to receive a fair trial.
[8] Defense counsel later back struck Ms. Kidder, using its twelfth peremptory challenge. Ms. Bergeaux served as a juror in this case.
[9] La. R.S. 15:432 provides in relevant part:

A legal presumption relieves him in whose favor it exists from the necessity of any proof; but may none the less be destroyed by rebutting evidence; such is the presumption ... that the defendant is sane and responsible for his actions....
[10] La.C.Cr.P. art. 905.9 states:

The Supreme Court of Louisiana shall review every sentence of death to determine if it is excessive. The court by rules shall establish such procedures as are necessary to satisfy constitutional criteria for review.
[11] La.S.Ct.R. 28 § 1 states in relevant part:

Every sentence of death shall be reviewed by this court to determine if it is excessive.
[12] Dr. Benoit's testimony at the penalty phase was consistent with his testimony at the sanity hearing. See discussion of assignment of error number one, supra. Importantly, Dr. Benoit's penalty phase testimony reiterated his finding that the defendant's intelligence test scores fell "in the low borderline range, close to mild mental retardation."
[13] The penalty phase verdict forms reveal that the jury returned the sentence of death after finding the following aggravating circumstances, expressed in quotation marks below:

Count 1the first degree murder of Rhonada Marie Guillory: "(1) More than one person (victim)."
Count 2the first degree murder of Priscilla Ann Guillory: "(1) More than one person (victim)."
Count 3the first degree murder of Keisha Guillory: "(1) Victim under the age of 12 years of age."
[14] In State v. Deal, 00-0434 (La.11/28/01), 802 So.2d 1254, the defendant killed his two-month-old son by sticking a paper towel down the child's throat to obstruct his airway. When this did not succeed in stopping the child's crying, the defendant picked the child up and threw him against the crib, fracturing the child's skull.

In State v. Deruise, 98-0541 (La.4/3/01), 802 So.2d 1224, the defendant shot and killed an eleven-month-old infant during an armed robbery.
In State v. Connolly, 96-1680 (La.7/01/97), 700 So.2d 810, the defendant, a Sunday school teacher, slashed the throat of his nine-year-old victim behind a church after church services. The victim's father found him alive in a pool of blood, but the victim died shortly after arriving at the hospital. The state argued that the victim was sexually abused by the defendant based upon the dilation of the victim's anus, although no other evidence supported this claim.
In State v. Sepulvado, 93-2692 (La.4/8/96), 672 So.2d 158, the defendant, over a three-day period, tied a rope around his six-year-old stepson's neck, threatened to hang him, refused to feed him, beat him, put his head in the toilet and flushed, kicked him from one room to another, and, finally, put him in a tub of scalding water which produced third-degree burns over sixty percent of the victim's body.
In State v. Deboue, 552 So.2d 355 (La. 1989), during the course of an aggravated burglary, the defendant slashed the throats of the six and eleven-year-old victims, allowing them to drown in their own blood.
In State v. Copeland, 530 So.2d 526 (La. 1988), the defendant and his co-defendant, George Brooks, repeatedly raped an eleven-year-old boy and shot him several times. See also State v. Brooks, 505 So.2d 714, rev'd, 94-2438 (La.10/16/95), 661 So.2d 1333.
In State v. Brogdon, 457 So.2d 616 (La. 1984), the nineteen-year-old defendant and a seventeen-year-old accomplice lured the eleven-year-old victim into their car, drove her to an isolated spot, raped her repeatedly, forced oral sex, and then tortured her by beating her with a brick, shoving sharp objects into her vagina, and cutting her with a broken bottle. The defendant, who was borderline mentally retarded, was under the influence of alcohol at the time.
In State v. Loyd, 489 So.2d 898 (La.1986), the twenty-five-year-old white defendant kidnapped a three-year-old white female victim, raped her vaginally and anally, and drowned her in a ditch. On October 29, 1993, the sentence was vacated by the United States Court of Appeal for the Fifth Circuit on the ground of ineffective assistance of counsel at the penalty phase. The state was ordered to sentence the defendant to life imprisonment or to retry the sentencing phase. See State v. Loyd, 96-1805 (La.2/13/97), 689 So.2d 1321 (commutation instruction mandated by La. C.Cr.P. art. 905.2(B), 1995 La. Acts No. 551 may apply to the defendant's resentencing penalty trial although it was not in effect at the time of the offense). A subsequent penalty phase hearing ended in a mistrial. Venue was changed to Vermillion Parish for this fourth penalty phase hearing, following which the defendant was sentenced to life imprisonment without benefit of parole, probation, or suspension of sentence.
[15] In State v. Anthony, 98-0406 (La.4/11/00), 776 So.2d 376, the defendant was an ex-employee of the Louisiana Pizza Kitchen restaurant in the French Quarter. In December of 1996, he returned to the restaurant with two others, systematically shot the four employees who were there, killing three, and then stole $2,549.84 from the restaurant safe.

In State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162 (statutorily superceded in part by La.C.Cr.P. art. 905.2(A) regarding who may give victim impact testimony), the defendant was an ex-employee of a Calendar's restaurant in Baton Rouge. On the morning of November 19, 1995, he returned the restaurant and shot three employees, killing two. Two other employees escaped from the scene. The defendant also stole approximately $7,000 from the restaurant's office.
In State v. Baldwin, 96-1660 (La.12/12/97), 705 So.2d 1076, the defendant's wife left him left him on July 14, 1994 after eight years of marital strife and violence, and emergency room treatment that day for injuries inflicted by the defendant. A week later, the defendant purchased a shotgun, sawed off a segment of it, and went to the home of J.O. Woodfin, a man with whom his wife was associating. The defendant shot and killed his wife, Woodfin, and two other men who at the residence in the presence of Woodfin's two children.
In State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, the defendant was an ex-employee of Cajun's Fabulous Fried Chicken restaurant in Baton Rouge. On May 27, 1991, he who returned to the restaurant and asked the manager to rehire him. The manager refused, but assisted the defendant in finding a different job by giving him money to buy a newspaper, reviewing the classifieds, contacting a Popeye's restaurant and making an appointment for the defendant. The defendant then decided to rob the restaurant, and when the manager again refused to rehire him, the defendant shot the manager and the cook was also present, killing the cook.
In State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272, the defendant eighteen-year-old wife left him in 1987 after one year of marriage and obtained a restraining order against him. The defendant tracked her down and learned that she had been seen in the company of a seventeen-year-old male named Jamie Pitre. The defendant then went to Pitre's residence and shot Pitre in the back of the head and his wife in the face, killing them instantly.
In State v. Deboue, 552 So.2d 355 (La. 1989), the defendant and his brother went to the apartment of Bettina Miller in New Orleans, intending to steal money because they had lost their own money in a dice game earlier that evening. Once in the apartment, the defendant slashed the throat of six-year-old Nigquika Miller and of eleven-year-old Jamal Moore.