DO NOT PUBLISH

**STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT**

**11-887**

**STATE OF LOUISIANA**

**VERSUS**

**GREGORY DWAYNE HARRELL**

************

**APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 302,365
HONORABLE PATRICIA EVANS KOCH, DISTRICT JUDGE**

************

**J. DAVID PAINTER
JUDGE**

************

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and J. David Painter, Judges.

**CONVICTIONS AFFIRMED; SENTENCE VACATED AND REMANDED FOR RESENTENCING.**

**Gregory D. Harrell**
**Richwood Correctional Center**
**Unit 4**
**180 Pine Bayou Circle**
**Monroe, LA 71202**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     Pro se

**Edward K. Bauman**
**P.O. Box 1641**
**Lake Charles, LA 70602**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     Gregory Dwayne Harrell

**James C. Downs**
**Brian D. Cespiva**
**P.O. Box 1472**
**Alexandria, LA  71309**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**PAINTER, Judge**

Defendant, Gregory Dwayne Harrell, appeals his conviction on two counts of simple burglary of a motor vehicle and his conviction on a habitual offender bill as a fourth felony offender. For the following reasons, we affirm the conviction, vacate the twenty year enhanced sentence, and remand for resentencing.

**FACTS**

In March 2010, John Muder lived on Navaho Trail in Alexandria, where he worked as a teacher and a coach. The subdivision he lived in, Cherokee Village, was large and mostly consisted of two streets, Navaho and Cherokee Lane. Mr. Muder testified as follows about the events of March 25, 2010:

> Well, it was about ten o'clock at night and . . . my wife made me take the trash out. So I went outside and I put the trash in the trash can and about that time I heard like a metallic noise, like a chink, you know, . . . and I looked and it was a bicycle riding up a driveway across the street from me. And the house is directly across the street from mine, some older people live there. The man was about I think eighty-seven or eighty-eight . . . . He was bedridden at the time and his wife was also around the same age, . . . and so it was pretty much just her by herself there and I knew she wasn't riding a bike in the middle of the night . . . . So I went over across the street and there was nobody back there, all there was [] a bike laying down. And so I said, hey, you know, who is back here, said it twice, and then the defendant came walking out from behind the shed they had in their backyard. And I said, hey, man, what you doing back here. And he said, I'm just taking care of something.

Mr. Muder's conversation with Defendant was face-to-face and occurred in the light cast by the carport fixture and the street lamps. When Defendant refused to be more specific about his activities, and when Mr. Muder retrieved his phone from his pocket, Defendant mounted his bike and rode away. He passed within two feet of Mr. Muder. Defendant dropped a

1

purse, some cards, some checkbooks, and some other things at the end of the driveway. Mr. Muder also noticed that Defendant was carrying two or three women's wallets. It seemed to Mr. Muder that Defendant panicked and fled. By the time the 911 operator answered, Defendant had been gone ten seconds.

Mr. Muder recalled that Defendant was wearing all black: a black skull cap, oversized headphones, a big fluffy black jacket, and some light colored gloves. Mr. Muder thought Defendant's attire was odd because it was not cool enough for the jacket and gloves. Mr. Muder himself was wearing shorts and a tee shirt. Mr. Muder went behind the shed and discovered identification, including social security cards, credit cards, and library cards.

In compliance with the instructions given to him by law enforcement, Mr. Muder waited in the driveway for an officer to arrive. As he waited, he called Rob Antoon, who was a co-member of the neighborhood watch, which had been formed because of frequent break-ins in the neighborhood. Corporal Todd Beaman, a patrolman with the Alexandria City Police, arrived five to seven minutes after Mr. Muder called to report the incident. Mr. Muder then gave Officer Beaman a description of the person he had seen, pointed out the items left behind by the man, and assured the officer that he had touched nothing. Mr. Muder also described the bike, stating that the only thing that stood out about it was the bullhorn shaped handlebars.

Mr. Muder stated that, once the officer told him the purse belonged to Kristy Flynn, who also lived in the subdivision, he called Antoon again and gave him the information. Mr. Antoon called John Flynn, Mrs. Flynn's husband, and he met them in the driveway where the encounter occurred.

2

At the time of trial, Mrs. Flynn and her husband had lived on Cherokee Lane in Alexandria for about a year and a half and in the Cherokee Village Subdivision for eleven years. On March 25, 2010, Mrs. Flynn arrived home from the grocery store around 8:30 or 9:00 p.m. She parked her vehicle under the carport and brought her groceries inside. She left her purse and some of her bags in the car. Her purse, which contained her wallet, was on the front passenger-side seat.

Mrs. Flynn testified that she returned outside to retrieve the rest of her bags after three to five minutes and discovered that her purse was missing. Mrs. Flynn did not know Defendant, and she did not give him permission to go into her car or to take her purse. When Mrs. Flynn called her husband to tell him, she discovered that he already knew. He had been notified by Mr. Antoon that Mr. Muder had found her purse. Between an hour and an hour and a half later, an officer stopped by to return her purse; all of Mrs. Flynn's belongings were returned with the bag. Mrs. Flynn paid approximately ninety dollars altogether for her purse and wallet.

On cross-examination, Mrs. Flynn stated that there was no damage to her vehicle, which had been left unlocked. She did not see the burglary take place.

Corporal Todd Beaman, a patrolman with the Alexandria City Police, testified that he responded to Mr. Muder's call. After collecting evidence from Mr. Muder, he received a report that Megan Haworth's vehicle had been burglarized. The Haworth burglary took place on Plantation Drive, which was located between Mrs. Flynn's home and the place where officers stopped Defendant. Both Ms. Haworth's neighborhood and Mr. Flynn's street were connected to Prescott St.

3

Ms. Haworth lived on Plantation Drive in Alexandria, which was part of the Plantation Acres Subdivision. It was next to the Cherokee Village Subdivision. Ms. Haworth shared her home with her boyfriend and two sons. On the afternoon of March 25, 2010, Ms. Haworth arrived home around 4:00 or 5:00 p.m. and parked her automobile in her driveway under the carport. Ms. Haworth left her purse in her car. She went to retrieve it around 11:00 p.m. Ms. Haworth did not see her purse, so she went inside to ask her boyfriend if he had moved it. He had, but he had then returned it to the vehicle. When she and her boyfriend went outside to continue the search, they noticed that one of the car doors had not been closed all the way. Ms. Haworth reached for the door, but her boyfriend stopped her; he said someone had opened the door. Her car was unlocked, and her boyfriend indicated where he had left her purse.

Ms. Haworth said that her parents left her house around 9:00 p.m., so the purse must have been taken between that time and 11:00 p.m., when she went to retrieve the item. The vehicle door was not open when she walked her parents to their car. Ms. Haworth's boyfriend failed to re-lock her car when he returned her bag to it earlier in the evening. Ms. Haworth had given no one other than her boyfriend permission to enter her car that evening. Ms. Haworth did not know Defendant and did not give him permission to enter her automobile or to take anything from her car.

Ms. Haworth recalled that her purse contained multiple items, including a pink Samsung camera that had been a present from her boyfriend. Other than the camera, Ms. Haworth had about eighty dollars in cash in her purse. The value of everything taken amounted to approximately $220.00.

4

Patrolman Andre Williams apprehended Defendant on England Drive. An officer called Mr. Muder a couple of hours after the incident, told him that they had apprehended Defendant, and asked Mr. Muder to identify him at the scene where they stopped Defendant. Mr. Muder noticed that Defendant was still wearing the same clothes as before. Mr. Muder positively identified Defendant as the man from the encounter and had no doubt about the identification. The bicycle with the unusual handlebars that Defendant was riding at the time of his arrest was the same bike that Mr. Muder saw Defendant with during their encounter. Defendant was found to have with him a pink Samsung camera which was later identified as belonging to Ms. Haworth, as well as headphones and gloves.

At trial, Mr. Mr. Muder pointed to Defendant and, again, identified him as the man he met in his neighbor's yard and as the man whom he identified for the police.

## DISCUSSION

Error Patent Review

As required by La.Code Crim.P. art. 920, the court reviews all appeals for errors patent on the face of the record. After reviewing the record, we find two errors patent, and the court minutes of the habitual offender sentencing require correction.

The court originally sentenced Defendant to ten years for his two convictions of simple burglary. When questioned by the prosecutor for clarification, the following exchange occurred:

BY MR. GIORDANO:

> Your Honor, we have no objection to him –
> this time running concurrent with any other time
> he's serving. And just for clarification[,] I note we

> gave him – the Court sentenced to ten years to the Department of Corrections. Is that on each count or - -

BY THE COURT:

> No, I'll do them together.

BY MR. GIORDANO:

> Okay. Ten and ten concurrent?

BY THE COURT:

> Yes. Ten and ten concurrent on the two counts.

Later, in restating the sentence for the court staff, the judge stated, "he is sentenced to the Department of Corrections for a period of ten years. Two charges will run concurrent."

The State filed a habitual offender bill which listed Defendant's two recent convictions for simple burglary as well as Defendant's prior convictions. At the conclusion of the bill, the State requested that Defendant be "sentenced as a fourth felony offender in accordance with the provisions of *LSA-R.S. 15:529.1A(1)(b)* and sentenced to a term of imprisonment of not less than twenty (20) years and not more than life."

At the close of the habitual offender proceeding, the prosecutor asked that the "previous sentence in this docket number be vacated and a new sentence imposed as him being declared as a – him being Mr. Harrell declared as a fourth time felony offender." The court, in finding Defendant a fourth offender, stated: "[a]s a result of that I am going to vacate his previous sentence that was imposed and [impose] a new sentence under that habitual offender law." The judge later vacated the previous sentence and sentenced Defendant to twenty-five years in the Department of Corrections. At a subsequent point in the proceeding, the court reduced the sentence to

6

twenty years. The following exchange further indicates that a single habitual offender sentence was imposed:

BY THE COURT:

> And it will run concurrent. Or just - what do y'all - -

BY MR. GIORDANO:

> It's my understanding, Your Honor, that it should just be one habitual offender conviction.

The court's Written Reasons on Habitual Offender Bill again confirmed that a single twenty-year sentence was imposed for Defendant's fourth felony offender status.

The trial court erred in failing to specify which of Defendant's two sentences it intended to enhance, or whether it intended to enhance both. In *State v. Webster*, 95-605, p. 9 (La.App. 3 Cir. 11/2/95), 664 So.2d 624, 630, a case in which the defendant was convicted of four counts of armed robbery, this court addressed a raised sentencing issue similar to the one in the present case, finding that:

> the trial court erred in that the record does not reveal which of defendant's four armed robbery convictions was being enhanced. Additionally, the trial court should have imposed a separate sentence on each of the three remaining convictions. Therefore, defendant's sentence is indeterminate as he was convicted of four counts of armed robbery and only a single sentence was imposed. See *State v. Bessonette*, 574 So.2d 1305 (La.App. 3 Cir.1991); La.Code Crim.P. art. 879. Accordingly, defendant's sentence will be vacated and the case remanded to the trial court for clarification as to which count is being enhanced and for imposition of separate sentences on the remaining three counts. See *State v. Parker*, 593 So.2d 414 (La.App. 1 Cir.1991).

Additionally, it is unclear whether the court vacated only one or both of Defendant's original ten-year sentences. Accordingly, Defendant's habitual offender sentence of twenty years is vacated and the case remanded

7

for resentencing with the trial court being instructed to specify which of Defendant's two sentences is enhanced or whether both sentences are enhanced. The trial court should likewise specify which original sentence or sentences were vacated.

<u>Sufficiency of the Evidence</u>

Defendant asserts that: "The trial court erred in finding Gregory Harrell guilty of two counts of simple burglary of a motor vehicle." The defense contends that the State failed to prove that Defendant entered the cars because Mrs. Flynn only testified that her purse was removed from her car.

The defense posits that the prosecution also failed to prove its case in reference to Ms. Haworth. Ms. Haworth's camera was in her purse, which was left in her car, and the camera was found in Defendant's possession. However, the purse was never recovered. Additionally, the witness who notified the police did not see Defendant in any of the vehicles. The witness only saw Defendant with the items removed from the automobiles. Defendant argues, therefore, that his convictions and sentences should be reversed.

In his pro se appellant's brief, Defendant also "contends that the evidence adduced at trial failed to prove beyond a reasonable doubt the requisite elements of simple burglary." Like his appellate attorney, Defendant argues that this assertion has merit because the State failed to call any witness who had seen Defendant entering or exiting one of the burglarized vehicles. Further, the prosecution failed to present any paperwork or photographic proof verifying Ms. Haworth's testimony that the camera recovered from Defendant's possession belonged to her.

Defendant further complains that neither Mrs. Flynn, Ms. Haworth, nor Mr. Muder testified as eyewitnesses. None of the witnesses saw Defendant enter or exit the automobiles; therefore, they did not see Defendant either complete or attempt to complete the act of simple burglary. Defendant urges that a more appropriate conviction would have been for possessing stolen goods. Based on these contentions, Defendant asks this court to overturn his convictions.

The Louisiana Supreme Court has discussed the standard of review for evaluating the sufficiency of the evidence on appeal:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. It is not the function of an appellate court to assess credibility or re-weigh the evidence.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86 (citations omitted).

"Simple burglary is the unauthorized entering of any . . . vehicle, . . . with the intent to commit a felony or any theft therein, other than as set forth in R.S. 14:60." La.R.S. 14:62(A). "Theft is the . . . taking of anything of value which belongs to another, . . . without the consent of the other to the . . . taking, . . . . An intent to deprive the other permanently of whatever may be the subject of the . . . taking is essential." La.R.S. 14:67(A).

The evidence presented at trial shows that Mrs. Flynn and Ms. Haworth's vehicles were entered into without their permission on March 25,

2010. The person who entered their vehicles without permission took some of their belongings without their permission. The belongings consisted of items of value, which included purses, money, and a digital camera. Defendant was seen in the neighborhood around the time of the burglaries and found to be in possession of the items taken during the burglaries within a short time frame after the burglaries were discovered.

In factually similar cases, the courts of this state have found that where a suspect is found in possession of stolen goods, it is sufficient to sustain a simple burglary conviction. *State v. Tassin* 08-367 (La.App. 3 Cir. 11/5/08), 997 So.2d 750; *State v. Jacobs*, 558 So.2d 1220 (La.App. 1 Cir.), *writ denied*, 564 So.2d 319 (La.1990).

When the evidence presented at the trial herein is viewed in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of both simple burglary charges proven beyond a reasonable doubt.

Sanity Commission

In his first counsel-filed assignment of error, Defendant claims that "[t]he trial court erred in denying defense counsel's request for appointment of a Sanity Commission." In his third pro se assignment of error, Defendant claims that "the Judge abused her discretion for not granting Petitioner['s request for sanity commission examination . . . Therefore Petitioner contends after the Judge['s verdict at sentencing the trial Judge 'ordered' that the Petitioner be evaluated." In his fourth pro se assignment of error, Defendant contends that he "was examined by the Federal Government doctors Social Security Administrative doctor in between Jan, 2010 and March, 2010 and was determined disabled mentally, which could have lead [sic] to such

10

outburst and actions at trial." Defendant avers that the trial court's denial of the sanity commission constituted an abuse of discretion and that, as a result, this court should vacate Defendant's convictions and sentences, remand the matter to the trial court, and order the trial court to have him examined by a sanity commission.

> "A criminal defendant has a constitutional right not to be tried while legally incompetent." *State v. Carmouche*, 01-0405, p. 29 (La.05/14/02), 872 So.2d 1020, 1041. There is a legal presumption that the defendant is sane and competent to proceed. *State v. Carmouche*, 01-0405 at 30, 872 So.2d at 1041. The legal presumption that the defendant is sane and responsible for his actions may be destroyed by rebutting evidence. LSA-R.S. 15:432. *See also, State v. Carmouche*, 01-0405 at 30, 872 So.2d at 1041, n. 9.

> The appointment of a sanity commission is not a perfunctory matter, a ministerial duty of a trial court, or a matter of right. *State v. Carmouche*, 01-0405 at 30, 872 So.2d at 1041-42. The mental incapacity of the defendant to proceed may be raised at any time by the defense, the district attorney, or the court. LSA-C.Cr.P. art. 642; *State v. Williams*, 03-942, p. 6 (La.App. 5 Cir. 1/27/04), 866 So.2d 1003, 1008, *writ denied*, 04-450 (La.6/25/04), 876 So.2d 832. Any question regarding a defendant's mental capacity must be deemed by the court to be bona fide and in good faith before the court considers if there are reasonable grounds to doubt capacity. *State ex rel. Seals v. State*, 00-2738, p. 6 (La.10/25/02), 831 So.2d 828, 833.

> The trial court has discretion in deciding whether to order a sanity commission to inquire into the defendant's present mental capacity to proceed. *State v. Fish*, 99-1280, p. 4 (La.App. 5 Cir. 4/12/00), 759 So.2d 937, 939. A defendant's mental capacity to proceed is determined by the procedure set forth in LSA-C.Cr.P. art. 647, which states:

>> The issue of the defendant's mental capacity to proceed shall be determined by the court in a contradictory hearing. The report of the sanity commission is admissible in evidence at the hearing, and members of the sanity commission may be called as witnesses by the court, the defense, or the district attorney. Regardless of who calls them as witnesses, the members of the commission are subject to cross-examination by the defense, by the district attorney, and by the court. Other evidence pertaining to the defendant's mental capacity to

> proceed may be introduced at the hearing by the defense and by the district attorney.
>
> A trial court's determination on a defendant's mental capacity to proceed is entitled to great weight on appellate review, and will not be overturned absent an abuse of that discretion. *State v. Fish*, 99-1280 at 4, 759 So.2d at 939.

*State v. Robinson*, 09-371, pp. 6-7 (La.App. 5 Cir. . 3/23/10), 39 So.3d 692, 696-97.

Defense counsel filed a motion for appointment of a sanity commission on November 16, 2010. In it, he alleged that there was good reason to believe that Defendant suffered from a mental disease or defect that materially limited his mental capacity to understand the proceedings against him or to assist in his defense. Further, defense counsel alleged that Defendant's mental condition rendered him unable to distinguish right from wrong and that he was insane at the time of the offense. Defense counsel asserted that his belief was based on Defendant's adversarial relationship with his prior attorney, visits with Defendant, his belief that Defendant did not understand the charges, Defendant's outburst in court on November 15, 2010, and Defendant's belief that everyone was trying to "railroad" him.

On the date the motion was filed, defense counsel informed the trial court that, after discussions with Defendant and his family, he learned that Defendant had been under the care of a psychiatrist for paranoid schizophrenia in his "younger years." Defense counsel additionally stated that Defendant had received some psychological treatment, "has been on" medication, and received social security disability benefits as a result of his condition. Defense counsel further informed the trial court that Defendant's relationship with his previous attorney had been fraught with problems, noted that Defendant had an outburst in court the previous day, stated that he

12

was not convinced that Defendant fully understood or appreciated what he was charged with and the sentence he could receive, and questioned Defendant's ability to assist in his defense. The State opposed the motion, pointing out that Defendant had assisted counsel during jury selection and that there had been no medical evidence introduced regarding any type of insanity. After hearing the argument of counsel, the trial court noted that a diagnosis of mental illness would not necessarily be an impediment to his ability to assist counsel. The trial court then denied the motion.

On December 17, 2010, Defendant informed the trial court that he wished to represent himself. During that discussion, defense counsel re-urged his motion to appoint a sanity commission. At that time, the trial court asked Defendant if he suffered from a mental illness. Defendant stated that he was mentally ill from being in jail but that he was not under a doctor's care. He stated that he had taken medication for depression and suicide attempts but that he had discontinued the medication on his own.

Defendant asserts that the trial court's abuse of discretion is evidenced by Defendant's allegations that he had been the victim of racism and threats and also by Defendant's belief that his trial attorney was involved in a plot to convict him. Defendant contends that there were additional indicators in the record that a sanity commission should have been granted, including that he had been hospitalized for depression and suicide attempts, that his ramblings in court indicated that he did not understand the consequences of the proceedings, and related matters.

Defendant further argues that this claim is supported by the trial court's own actions after sentencing. Defendant alleges that, following

imposition of sentence, the trial court ordered him to be evaluated. Defendant claims that the evaluation was never performed.

The fifth circuit noted, in *State v. Williams*, 02-1016 (La.App. 5 Cir. 2/25/03), 841 So.2d 936, *writ denied*, 03-2205 (La. 8/20/04), 882 So.2d 571, that defense counsel failed to introduce evidence in support of his allegations regarding the need for a sanity commission, did not subpoena or call witnesses to testify regarding the defendant's alleged incompetency, and failed to introduce medical records to support his contentions. The fifth circuit found that the trial court did not err in denying the motion to appoint sanity commission under those circumstances. *See also State v. Normand*, 04-840 (La.App. 3 Cir. 12/15/04), 896 So.2d 98, *writ denied*, 05-231 (La. 5/6/05), 901 So.2d 1094.

In its decision in *Williams*, 841 So.2d 936, the fifth circuit cited *State v. Wilkerson*, 403 So.2d 652 (La.1981). In *Wilkerson*, the supreme court stated the following regarding mental incapacity to proceed: "[w]here the issue is presented by bare allegations without supporting evidence, the exercise of discretion conferred on the trial judge will not be disturbed." *Id.* at 658 (citations omitted).

When the hearing on the written motion to appoint a sanity commission was held in the case at bar, defense counsel presented no witnesses or medical records to support his claim that Defendant suffered from a mental disease or defect which materially limited his mental capacity to understand the proceedings against him or to assist in his defense. It was merely alleged that Defendant suffered from schizophrenia. When the issue was re-urged, the trial court questioned Defendant regarding his capacity. No other witnesses were called to support the motion, and no medical

14

records were submitted to support Defendant's claims that he had taken medication for depression and suicide attempts and had been hospitalized. Thus, we cannot say the trial court abused its discretion in failing to appoint a sanity commission.

At the original sentencing hearing, the trial court sentenced Defendant and stated that it would ask the department to address any mental or substance abuse concerns. After Defendant was sentenced as a habitual offender, the trial court recommended that Defendant "get some mental health treatment." The trial court subsequently sentenced Defendant to twenty-five years with the "recommendation of mental health treatment." This order for mental health evaluation does not signal that Defendant was incapable of understanding the proceedings against him or assisting his counsel.

Defendant asserts that the need for appointment of a sanity commission was supported by the Social Security Administration determination in early 2010 that he was disabled. At the hearing on the written motion to appoint a sanity commission, defense counsel informed the trial court that Defendant received disability benefits as a result of his condition. That allegation was not supported by any documentation or testimony at the hearing on the motion. Further, the letter from the Social Security Administration attached to Defendant's pro se brief as Exhibit 2 will not be considered by this court, as it was not filed in the trial court. *See* Uniform Rules–Courts of Appeal, Rule 1-3.

Therefore, we find no error in the trial court's decision not to appoint a sanity commission.

<u>Self Representation</u>

Defendant asserts that "[t]he trial court erred in allowing Gregory Harrell to represent himself at trial and the habitual offender hearing." The supreme court in *State v. Bell*, 09-199, pp. 13-27 (La. 11/30/10), 53 So.3d 437, 445-54, *cert. denied*, ___ U.S. ___, 131 S.Ct. 3035 (2011) (citations omitted) addressed the issue of self-representation by defendants with mental illnesses or defects:

> The Sixth Amendment expressly provides that an accused in a criminal trial has the right to the assistance of counsel. However, the Supreme Court in *Faretta v. California*, held the Sixth Amendment also "implies a right of self-representation." 422 U.S. 806, 822, 95 S.Ct. 2525, 2534, 45 L.Ed.2d 562 (1975)[.] The *Faretta* Court noted that the self-represented defendant can not later claim he was denied effective assistance by his own representation. *Id.* at 834, 95 S.Ct. at 2541 n. 46. Certain limits have been put on the right of self-representation due to the tension between it and the express right to the assistance of counsel.
>
> . . . .
>
> . . . [T]he question presented is whether the waiver was valid under existing state law, which involves determining whether the defendant was competent to waive counsel and whether he did so knowingly and intelligently with full understanding of the risks and possible consequences. "The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Trial courts should inquire into the accused's age, education, and mental condition in deciding, on the totality of the circumstances, whether the accused understands the significance of the waiver. Further, a defendant must be made aware of the dangers and disadvantages of self-representation so that the record demonstrates "he knows what he is doing and his choice is made with his eyes open." In other words, a defendant must know the consequences of his action. The assertion of the right must also be clear and unequivocal.

Defendant contends that the trial court failed to ask about Defendant's age, level of education, and whether Defendant had any legal training.

16

Instead, the district court noted that Defendant assisted in choosing his jury, made nice gestures to the jurors, and had great eye contact. The defense points out that the trial court failed to mention the nature of the charges against Defendant and the applicable penalty range during the dangers and disadvantages colloquy. The district court dismissed appointed counsel over the attorney's strenuous objections and ordered him to assist Defendant in his self-representation. The trial court further denied Defendant's motion for a continuance.

The defense further points out that, when Defendant refused assistance of counsel in reference to his habitual offender bill, the trial court conducted a dangers and disadvantages hearing but failed to inquire into Defendant's age, education, and mental condition. Additionally, the defense asserts that the district court failed to advise Defendant of the consequences of being found a habitual offender. The defense urges that Defendant was prejudiced because he failed to file a timely objection to the habitual offender bill. The defense adds that Defendant expressed a desire for a life sentence and complains that the sentencing court continued with the hearing despite the objection raised by the attorney aiding Defendant. The attorney informed the court that Defendant had "some emotional and mental health issues that keep him from understanding the gravity of the proceedings."

Defendant asserts, therefore, that the trial court failed to make the inquiries necessary to determine whether Defendant should be allowed to represent himself. The defense concludes that this is tantamount to a denial of the right to assistance of counsel and meant that Defendant's waiver of this right was neither knowing nor intelligent. The defense urges, therefore, that this court should reverse Defendant's convictions and sentences.

17

The record shows that Defendant wanted to actively participate in and ultimately take over his defense. In the pretrial setting, Defendant repeatedly filed pro se motions. On the first day of trial, November 17, 2010, Defendant moved to represent himself at trial. The trial court's questioning of Defendant at that juncture shows that the trial court made efforts to ensure that Defendant was fully cognizant of the repercussions of his decision.

The record shows that, during the trial, Michael Jeansonne, who had previously represented Defendant and was ordered to assist him in self-representation, had to leave because of a family medical appointment. At that time, Defendant asked for another attorney to assist him at trial; when he maintained that he wanted to represent himself, the district court did not call another attorney to replace Mr. Jeansonne. However, after the State rested its case, Defendant asked if he could consult with an attorney before presenting his defense, and the trial court granted Defendant's request by sending someone to search the other courtrooms for another indigent defender. Defendant then had an opportunity to ask that attorney, J. Marc Lampert, questions, and Defendant, thereafter, assured the district court that Mr. Lampert, who was familiar with the case because he had been the attorney originally assigned to represent Defendant, had satisfactorily addressed Defendant's concerns. At the trial court's request, Mr. Lampert stayed throughout the remainder of trial for the purpose of being available to Defendant in the capacity of a consultant. Defendant ultimately chose to refrain from testifying at trial; therefore, the State did not get to elicit prior crimes evidence.

Prior to trial, Defendant demonstrated his literacy, his grasp of legal issues, and his desire to act on his own behalf by repeatedly filing pro se

motions. At voir dire, Defendant demonstrated his ability to assist in his defense by making informed choices concerning which potential jurors should serve on the jury. At the dangers and disadvantages hearing, Defendant clearly and unequivocally maintained his desire to represent himself at trial over the express objections of his appointed attorney and against the advice of the district court. Defendant showed that he was prepared for trial when he revealed that he already knew what the witnesses were going to say and that he already had questions prepared for those witnesses. The district court took care to ensure that Defendant understood his right against self-incrimination and the consequences of waiving that right. Defendant showed his understanding of this right by not testifying at trial. The trial court also questioned Defendant about his history of mental illness, about any medications Defendant may have been taking, and about any current treatment Defendant may have been undergoing for mental illness. Nothing in Defendant's responses revealed a defect that would bar Defendant from being able to represent himself. Thus, Defendant demonstrated that his waiver of his right to counsel was knowing and voluntary.

Furthermore, as discussed in *Bell*, the fact that, due to his lack of legal training, Defendant may have made mistakes a licensed attorney would have avoided has no bearing on whether his decision to represent himself was knowing and voluntary because Defendant waived any claim of ineffective assistance of counsel when he asserted his right to self-representation.

The defense also asserts that the trial court erred in allowing Defendant to represent himself at his habitual offender hearing. The defense complains that the dangers and disadvantages colloquy was insufficient and

19

that Defendant should have been prohibited from self-representation because he expressed a desire for life imprisonment. Though the defense contends that Defendant was prejudiced by the failure to timely object to the habitual offender bill, it fails to either argue or demonstrate that there was a valid objection thereto.

On March 2, 2011, the sentencing court conducted a second dangers and disadvantages hearing in reference to Defendant's motion to represent himself for the habitual offender proceeding. The transcript of that hearing shows that Defendant clearly expressed his desire to represent himself even after both his attorney and the sentencing court advised him of the dangers and difficulties that would arise from the decision.

Though the defense asserts that Defendant was unfairly denied his right to assistance of counsel, examination of the record shows that Harold Murry acted, at a minimum, as co-counsel for Defendant even though he was no longer assigned to the case. The record shows that Mr. Murry was present at the habitual offender hearing, that Mr. Murry continued to interact with the court on Defendant's behalf, that Mr. Murry explained things to Defendant that Defendant did not understand, that Mr. Murry questioned and cross-examined the State's sole witness on Defendant's behalf, that Mr. Murry also made objections to the State's evidence, that Mr. Murry advised Defendant as to the wisdom of testifying at the hearing, and that Mr. Murry successfully made an oral motion for reconsideration of the habitual offender penalty. Therefore, the defense's assertion is without merit; Defendant was effectively represented by counsel at the habitual offender proceeding.

The defense complains that Defendant showed his lack of capacity by stating that he wished to receive life imprisonment. Examination of the relevant record passages shows that Defendant was requesting life imprisonment so that he could go to a "real" prison. He wanted to go to either Angola or Hunt Correctional Facility because his prior incarcerations at "satellite" facilities did not result in his rehabilitation. It appears that Defendant was expressing his desire for a penalty harsh enough to deter him from committing future criminal acts and for assignment to a penal facility that would be conducive to the rehabilitation of his criminal proclivities. Moreover, the district court did not impose life imprisonment. Hence, Defendant's request for life imprisonment, for the reasons expressed, does not show that Defendant was incapable of representing himself. Moreover, as Defendant received the minimum possible sentence, Defendant was not prejudiced by his statement.

Additionally, even though the defense contends that Defendant did not understand the consequences of being adjudicated a habitual offender, Defendant clearly indicated his understanding that the penalty he would receive upon being adjudicated a fourth felony offender would range from twenty years to life imprisonment.

Accordingly, we find no error in the trial court's decision to allow Defendant to represent himself.

Sufficiency of the Evidence on Multiple Offender Bill

Defendant argues that the State "failed to prove beyond a reasonable [doubt] that [he] was a fourth time felony offender." Defendant alleges that the State's exhibits fail to show he was represented by counsel at his prior guilty pleas or that he was advised of and waived his right against self-

incrimination, his right to trial by jury, and his right to confront his accusers. Based on this assertion, Defendant asks this court to vacate his habitual offender adjudication.

The State filed a multiple offender bill on December 7, 2010, alleging Defendant was a fourth felony offender. On March 2, 2011, Defendant filed a pro se Motion to Quash Habitual Offender Bill. Therein, he stated that the District Attorney filed the bill out of vengeance and trickery. He alleged that had he been afforded proper representation by an attorney and "they" had moved for appointment of a sanity commission, he would not have been convicted. He also alleged that the State improperly classified him as a four time offender when, in fact, he was a two time offender. He further alleged that his sentence was grossly out of proportion to the severity of the crime. The trial court denied the motion without a hearing on March 3, 2011. Defendant was subsequently adjudicated a fourth felony offender and sentenced to twenty years.

At the habitual offender hearing, Defendant objected to the introduction of State's Exhibits 1, 2, 3, and 4. He did not set forth a basis for that objection and further failed to object to the validity of his prior convictions.

In *State v. Lemon*, 08-619, p. 5 (La.App. 5 Cir. 12/16/08), 3 So.3d 20, 24, the fifth circuit sated: "[a] defendant must make a contemporaneous oral objection or file a written response to a habitual offender bill in order to preserve for appeal the issue of sufficiency of proof of a prior conviction based on a guilty plea." In *State v. Lewis*, 43,402, p. 12 (La.App. 2 Cir. 8/13/08), 990 So.2d 109, 117, the second circuit found: "[d]efendant did not

make an objection under La. R.S. 15:529.1(D)(1)(b) to the validity of his prior convictions and is barred from raising that issue now."

Defendant failed to attack the validity of his prior guilty pleas in his Motion to Quash and did not object to the validity of those convictions at the habitual offender hearing. Therefore, he is barred from attacking the sufficiency of those convictions on appeal. Accordingly, we find no error in the finding that Defendant was a fourth felony offender.

## CONCLUSION

Defendant's convictions are affirmed. Defendant's habitual offender sentence of twenty years is vacated, and the case remanded for resentencing with the instruction to specify which one of Defendant's two sentences is being enhanced or whether both sentences are being enhanced. The trial court is also to specify which original sentence or sentences are being vacated.

**CONVICTIONS AFFIRMED; SENTENCE VACATED AND REMANDED FOR RESENTENCING.**