# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT


20-504


**STATE OF LOUISIANA**

**VERSUS**

**JOEY ROGERS**

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, DOCKET NO. 11-1720
HONORABLE KEITH COMEAUX, DISTRICT JUDGE


\*\*\*\*\*\*\*\*\*\*\*

**SYLVIA R. COOKS**
**CHIEF JUDGE**
\*\*\*\*\*\*\*\*\*\*\*


Court composed of Sylvia R. Cooks, Chief Judge, Billy Howard Ezell and D. Kent Savoie, Judges.


**AFFIRMED.**

**Sherry Watters**
**Louisiana Appellate Project**
**P.O. Box 58769**
**New Orleans, LA  70158-8769**
**(504) 723-0284**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Joey Rogers**

**Jeff Landry, Attorney General**
**J. Taylor Gray, Assistant Attorney General**
**Louisiana Department of Justice**
**P.O. Box 94005**
**Baton Rouge, LA 70804**
**(225) 326-6200**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**COOKS, Chief Judge.**

On August 10, 2011, Defendant, Joey Rogers, was arrested for the August 9, 2011 shooting of Robert Butler. The record established Mr. Butler was a fifty-seven year-old man who had been an acquaintance of Defendant's family for several years. Defendant often referred to Mr. Butler as Uncle Rob. Defendant had just turned eighteen years of age a few months prior to the shooting.

Mr. Butler would often pick Defendant up and bring him places and to Mr. Butler's home in New Iberia. There was testimony that Mr. Butler would provide Defendant with alcohol and marijuana. Defendant also maintained on one occasion, when he was impaired, Mr. Butler sexually and inappropriately touched him and performed acts on himself in front of Defendant. It was later asserted by Defendant, that although these inappropriate sexual actions did not occur every time he visited with Mr. Butler, the acts of sexual molestation occurred on several occasions.

Despite this, Defendant acknowledged he continued to meet with Mr. Butler on a fairly regular basis. The night before the shooting, Defendant and his older brother, Jerry Rogers, spent the night at Mr. Butler's home. They left early the following morning to return to Franklin, where they were living. The following morning, Jerry had to return to New Iberia for his job at Wal-Mart. Joey went with his brother back to New Iberia and went to Mr. Butler's residence.

When Defendant first arrived, Mr. Butler was at a doctor's appointment, so Defendant went to the house of Devon White, who lived down the block from Mr. Butler. It was later stated by several people, that Defendant smoked "legal weed" while at the White residence. Defendant then left to visit Mr. Butler. He acknowledges he was in Mr. Butler's home, when he answered the door and a black male in a red cap and red tee shirt came in and shot Mr. Butler. The man then left the house.

2

Defendant dialed 911 and told them his uncle had been shot. He then left the home and went back to the White residence. According to people at the White residence, Defendant appeared to be in shock. He did not say anything while there, and left, going to the Wal-Mart where his brother was working. He told his brother that Uncle Rob had been shot. Defendant and his brother then immediately returned to Mr. Butler's house.

Police were at the scene by that point and placed Defendant in a police car. A dispatch call then was sent out for a black male in a red baseball cap and red tee shirt. Defendant was then transported to the police station, where he underwent extensive questioning. He maintained that while at Mr. Butler's house, there was a knock at the door and Mr. Butler, who was laying in bed, told him to go open the door. Defendant stated a black man in a red cap and tee shirt was at the door. He then followed Defendant to Mr. Butler's bedroom, at which point Defendant sat down in a chair. Without speaking, the man pulled a gun and shot Mr. Butler several times. According to Defendant, the man then turned around and walked out of the house.

Defendant remained in the interview room for approximately nine hours, when he was then allowed to leave the room for a cigarette break. During this thirty-minute period that Defendant was not in the interview room (and being filmed), Captain Gerald Savoy claimed Defendant called him over and the two then went into Captain Savoy's office. In his written report, Captain Savoy stated that Defendant confessed to him in his office that he had shot Mr. Butler. No other witness was present during this purported confession and it was not recorded or filmed.

Defendant maintained Captain Savoy had him brought into his office when he was taken outside for a break. Defendant told others Captain Savoy refused to believe his version of events and he was threatened with being sent to Angola. Defendant also maintained Captain Savoy punched him in the jaw, which he asserted

led him to change his statement of events. At that point Defendant stated he shot Mr. Butler because he had been sexually abusing him since he was sixteen years old and Mr. Butler had also threatened to tell everyone want he was doing to Defendant.

After being questioned for approximately twelve hours, Defendant then got into a car with Captain Savoy, and accompanied by a few other police cars, attempted to search for the murder weapon, which at one point Defendant stated he had found and then disposed of after the shooting. No gun was ever found. After further questioning back at the police station, Defendant was charged with second degree murder and appointed counsel.

On December 9, 2011, the State filed a bill of information charging Defendant with manslaughter, in violation of La.R.S. 14:31. On December 16, 2011, an Iberia Parish Grand Jury returned a bill of indictment charging him with second degree murder, in violation of La.R.S. 14:30.1. In a pre-trial hearing held on July 17, 2015, despite Defendant's continuing protests that his "confession" was coerced, Defendant's trial counsel stipulated to the admissibility of the "confession" he made during the police interrogation.

Pursuant to a plea bargain, on August 4, 2015, Defendant entered a plea of guilty to the lesser-included charge of manslaughter. Defendant stated, when he signed the plea, he was under the belief he would be subjected to a sentencing range of zero to forty years. However, within minutes of the signing of the plea, the State filed an enhancement under La.Code Crim.P. art. 893.3, changing the sentencing range from twenty to forty years, without benefit of probation or parole. Although this occurred after Defendant signed the plea, during the plea colloquy with the trial court, Defendant was explained that the new sentencing range was 20 to 40 years, with no eligibility for parole or probation. He then pled guilty before the district court. Shortly thereafter, and prior to sentencing, Defendant's trial counsel resigned her position as a public defender before sentencing.

4

New counsel was appointed and filed a motion to vacate the guilty plea. Specifically, counsel argued that "what [Defendant] 'agreed' to and what he believed he agreed to on August 4, 2015 was an open-ended plea to Manslaughter only. In fact the last minute [La.Code Crim.P.] art. 893.3 enhancement was not any part of [Defendant's] agreement." In preparation for the sentencing, Defendant's new counsel realized no documentation of Defendant's intellectual impairments had been produced. Reports and testing established that Defendant had a full-scale IQ of 63 (two standard deviations from the norm), a hearing disability and that he reads and functions at a third-grade level. A Child and Adolescent Psychiatrist, Dr. Loretta Ann Sonnier, was retained to interview and test Defendant as to the extent of his intellectual disability. Dr. Sonnier determined "within a reasonable degree of medical certainty, that when [Defendant] pled guilty in August 2015 his intellectual disability impaired his capacity to understand the plea agreement and effectively work with his defense counsel." She also concluded Defendant's "intellectual and hearing disabilities affect his ability to rapidly process, assimilate, remember, and respond to information presented in proceedings." Defendant's motion counsel argued his intellectual and hearing disabilities were such that he could not and did not have the understanding to knowingly and voluntarily enter the plea. Noting the failure of the Public Defender's Office to adequately protect the legal rights of Defendant, who was ill informed and misinformed regarding facts and ramifications surrounding the plea, counsel requested that the trial court vacate the plea under La.Code Crim.P. art. 559.

On September 26, 2017, the district court held a hearing on the motion to vacate the plea and took the matter under advisement. On October 6, 2017, the district court denied the motion in open court, with reasons. The trial court found that Defendant "understands more than [motion counsel] gives him credit for. He made appropriate responses to the detectives upon interrogation . . . and to the [trial

court] at the plea." The trial court also noted it had reviewed the confession and found it was "admissible based on what [it] saw." The court also noted there was no evidence produced at the hearing to establish Defendant was punched by an officer. The trial court also found the addition of the article 893.3 firearm enhancement was not sufficient to invalidate the plea. The court stated that even though the 893.3 notice was received after the plea was signed, and Defendant's prior counsel stated, in hindsight, she would not have taken the plea with the enhancement, the district court stated the following:

> However, during the plea colloquy the trial court discussed with [Defendant] the fact that the minimum sentence would be twenty years and the maximum sentence would be forty years." I asked him if any other promises were made. I asked him if there was [sic] any inducements to get him to plead guilty. He didn't say anything. He accepted the guilty plea. I don't know what happened between the time that the 893.3 notice was given to the defendant and the time of the plea and I have no evidence from Ms. Dunning that she did not discuss this and make a decision with Mr. Rogers that he wanted to still take the plea. It was shown that Ms. Dunning said that she probably wouldn't do it again in hindsight, as Monday morning quarterback, but there was no showing that any coercion was made to Mr. Rogers.

Defense counsel gave notice of an intent to seek a writ of the trial court's ruling, and the court issued a return date of November 6, 2017. However, no writ application was ever filed with this court. Nonetheless, a trial court's denial of a motion to withdraw a guilty plea may be corrected on appeal. *State v. Walton*, 98-1433 (La.App. 3 Cir. 3/24/99), 738 So.2d 36, *writ denied*, 99-1195 (La. 10/1/99), 748 So.2d 434.

Prior to the sentencing hearing, defense counsel filed a Memorandum in Support of Downward Departure from Minimum Mandatory Sentence pursuant to La.Code Crim.P. art. 893.3(H). On February 14, 2018, the trial court held a sentencing hearing. The trial court denied the request for downward departure and sentenced Defendant to twenty years at hard labor, with credit for time served, on February 14, 2018. The trial court noted, while La.Code Crim.P. art. 893.3(H) allows

it to deviate from the mandatory minimum if the sentence would be excessive, the court was not inclined to do so because of the benefit Defendant received by having a potential life sentence removed through the plea bargain. Twenty years is the minimum term required by La.Code Crim.P. art 893.3. A motion to reconsider sentence was denied.

Defendant now appeals, challenging his guilty plea and his sentence in two assignments of error:

> 1. The trial court erred in denying the Motion to Vacate the plea where the youthful, hearing impaired defendant, with an IQ of 63 and third grade reading level, lacked understanding, received insufficient and uninformed advice, no motion to suppress the confession was filed on his behalf, and the State's Art. 893.3 motion violated the plea agreement.
>
> 2. The district court erred in denying the Motion for Downward Departure and abused its discretion in imposing an excessive sentence on the youthful, limited defendant. The sentence is constitutionally excessive under the circumstances of this offense and this offender.

## ANALYSIS

In his first assignment of error, Defendant argues the district court erred by denying his motion to vacate his guilty plea. The argument has two general prongs: first, that he lacked the mental capacity to proceed; second, that his plea counsel was incompetent. According to La.Code Crim.P. art. 559(A): "Upon motion of the defendant and after a contradictory hearing, which may be waived by the state in writing, the court may permit a plea of guilty to be withdrawn at any time before sentence." Defendant in the present case filed his motion to vacate the plea before sentencing.

Regarding guilty pleas generally, the supreme court has stated:

> The entry of a guilty plea must be a free and voluntary choice on the defendant's part. *State v. Nuccio*, 454 So.2d 93 (La.1984). Due process requires that pleas of guilty be voluntary and intelligent relinquishments of known rights. The court must make an independent determination of whether the defendant's plea is made knowingly and intelligently through a colloquy wherein the defendant is questioned

7

about his decision and the constitutional rights he is waiving. *State v. Age*, 417 So.2d 1183 (La.1982).

*State v. Montalban*, 00-2739, p. 3 (La. 2/26/02), 810 So.2d 1106, 1108-09, *cert. denied*, 537 U.S. 887, 123 S.Ct. 132 (2002), *abrogated on other grounds by Padilla v. Kentucky*, 559 U.S. 356, 130 S.Ct. 1473 (2010).

The general test for capacity to proceed was explained by the supreme court in *State v. Odenbaugh*, 10-268, pp. 7-8 (La. 12/6/11), 82 So.3d 215, 228, *cert. denied*, 568 U.S. 829, 133 S.Ct. 410 (2012):

> In evaluating the legal capacity of a criminal defendant, this Court, noting [*State v.*] *Bennett*, [345 So.2d 1129 (La. 1977) ], explained that the trial court's decision regarding a defendant's competency to stand trial "should not turn solely upon whether he suffers from a mental disease or defect, but must be made with specific reference to the nature of the charge, the complexity of the case, and the gravity of the decision with which the defendant is faced." *State v. Carmouche*, 01-0405 (La. 5/14/02), 872 So.2d 1020, 1039. In Louisiana, a judicial examination of a defendant's competency has focused primarily on whether a defendant "understands the nature of the charge and can appreciate its seriousness." *See, Bennett,* 345 So.2d at 1138. Additionally, when a defendant's ability to assist in preparing his defense is at issue, the following questions must be considered:
>
>> whether he is able to recall and relate facts pertaining to his actions and whereabouts at certain times; whether he is able to assist counsel in locating and examining relevant witnesses; whether he is able to maintain a consistent defense; whether he is able to listen to the testimony of witnesses and inform his lawyer of any distortions or misstatements; whether he has the ability to make simple decisions in response to well-explained alternatives; whether, if necessary to defense strategy, he is capable of testifying in his own defense; and to what extent, if any, his mental condition is apt to deteriorate under the stress of trial.
>
> *Carmouche*, 872 So.2d at 1039 (*citing Bennett*, supra).

Defendant's expert, psychiatrist Dr. Loretta Sonner, testified Defendant would not have been able to testify at a trial, because his low mental capacity would

have required much more advanced preparation with counsel than he received. Testing indicated Defendant's IQ is 63. As the State points out, Sonnier acknowledged in her testimony that Defendant met some of the criteria of *State v. Bennett*, 345 So.2d 1129 (La. 1977), indicating he did generally understand the case and was able to assist counsel. However, the expert only assessed about half the *Bennett* criteria. It is apparent from the record that Sonnier did not assess Defendant in light of this state's prevailing legal standards. Thus, she was unable to address the district court's questions regarding Defendant's capabilities in light of *Bennett*, as can be seen from the following colloquy with the court:

> A.      So, when I approached his evaluation, I did not approach it the way that I approach competency evaluations. I did a circumscribed evaluation of competency to plead guilty.

> BY THE COURT:

> > Sustained.

> A.      (By witness) So you will be disappointed if you are looking to my report for the *Bennett* criteria.

> Q.      That's the standard in Louisiana.

> A.      For competency to stand trial.

> Q.      Yes, ma'am.

The foregoing testimony indicates Dr. Sonnier focused on a *medical* assessment of Defendant, and did not provide an opinion that was pertinent to the governing *legal* standard, i.e., *Bennett*. Therefore, Defendant did not meet the requisite burden of showing that he lacked mental capacity such that the district court should have vacated his guilty plea.

Regarding the other prong of his argument, Defendant essentially argues that his plea counsel was incompetent. Defendant in brief does not use the term "ineffective" and does not cite the seminal case on the issue, *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984), except in footnotes. To obtain

9

relief under *Strickland*, a defendant must show first that his counsel's performance was deficient and second, that said deficient performance improperly prejudiced his case. Defendant argues that incompetence regarding a guilty plea is distinct from an ineffectiveness argument, as the current argument is focused on whether the incompetence of counsel affected his understanding of the plea. Defendant cites *State v. Green*, 03-410 (La.App. 5 Cir. 10/28/03), 860 So.2d 237, *writ denied*, 03-3228 (La. 3/26/04), 871 So.2d 346, and a case it cites, *State v. Cook*, 32,110 (La.App. 2 Cir. 6/16/99), 742 So.2d 912, which both state that incompetence of counsel may be a basis for vacating a plea. As mentioned earlier, Defendant also cites *Strickland* in a footnote.

Defendant argues that plea counsel was incompetent for failing to determine whether there was a factual basis for the case. Another major portion of his argument is that plea counsel should have filed a motion to suppress his confession instead of stipulating to its admissibility.

Although the latter topic was much discussed during the hearing on the motion to vacate the plea, and it was quite clear that Defendant's motion counsel disagreed with plea counsel's strategy, there was little specificity in motion counsel's argument. In essence, motion counsel argued that the combination of Defendant's low IQ, the length of his interrogation, and some form of coercion rendered the confession inadmissible. By the end of the hearing, counsel argued that the general nature of the interrogation and Defendant's demeanor during it should have raised concerns to plea counsel regarding its admissibility. As noted earlier, the district court took the motion under advisement; during this time, the court reviewed ten to fifteen hours of footage before determining there were no admissibility issues regarding the confession.

However questionable some of plea counsel's decisions may appear, e.g., stipulating to the admissibility of the confession and allowing Defendant to speak to

10

a prosecutor without having her present, the confession itself would likely have formed a solid foundation for the State's second-degree murder case. Further, Defendant's confession to law enforcement and his confession to plea counsel apparently led her to formulate a strategy of seeking to secure a plea bargain in which Defendant would plead to the lesser charge of manslaughter and seek to obtain a lenient sentence. The fact that he had confessed to police, combined with his telling counsel that he was factually guilty, formed a logical basis for plea counsel's actions. It was not unreasonable for Defendant's plea counsel to believe Defendant had a strong chance of being convicted of second-degree murder, which would then have subjected him to the possibility of life imprisonment. Seen in this light, plea counsel's strategy of mitigation appears reasonable and falls under the aegis of trial strategy. Thus, we cannot say plea counsel's overall performance was deficient pursuant to *Strickland*. Faced with a confession which she apparently believed to be admissible and having reason to believe Defendant was factually guilty, plea counsel was logically justified in adopting a strategy of attempting to mitigate the ultimate sentencing term.

Motion counsel's examination of plea counsel at the hearing focused more on Defendant's alleged mental inability to freely and voluntarily confess his crime to police. The reasoning behind plea counsel's trial strategy was not systematically explored. On the other hand, motion counsel did raise questions to plea counsel and to Dr. Sonnier regarding Defendant's ability to understand the plea process. Plea counsel opined that she took enough time to explain the plea process to Defendant, noting that she had a background in special education. Dr. Sonnier testified that plea counsel should have taken more time for explanations, as Defendant did not appear to the psychiatrist to understand the proceedings.

Looking to the record of the plea itself, there is no indication in the record that anything was amiss or that Defendant did not understand the proceedings. The judge

who presided over the guilty plea proceeding was the same judge who presided over the motion to vacate said plea and the subsequent sentencing. In a detailed ruling in open court, the judge explained:

BY THE COURT:

> I've reviewed the documents that have been filed into the record, along with all the attachments to the motion, along with the exhibits that were filed by Ms. Bonin (Defendant's motion counsel) into the record, and I did watch that lengthy interview by the Iberia Parish Sheriff's Office. I have reviewed the transcript of the plea and also the interview given to the police.

> It's been offered and testified to that Mr. Rogers has a 63 full I.Q. score, but I find that he understands more than Ms. Bonin gives him credit for. He made appropriate responses to the detectives upon interrogation. He made appropriate responses to me at the plea. Just because a person has intellectual deficiencies does not absolve him from criminal culpability or the ability to assist counsel. I do not recall if Ms. Dunning ever asked if she knew Joey's I.Q. However, she did testify that she had to slowly explain things to Joey in order for him to understand them. This is precisely what Dr. Sonnier testified needed to be done with Joey so that he could properly comprehend and make intelligent decisions.

> Concerning the confession, I've reviewed the same and I find that it would have been admissible based on what I saw. Defense counsel complains that Joey's statements were inconsistent. Many defendants make inconsistent statements during interrogation, but that does not make the confessional statement inadmissible. It is admissible not because it is a confession, but because of the inconsistent statements. In my experience, most defendants don't tell the truth initially when confronted until these inconsistencies are shown to them. Mr. Rogers, in his pleadings, alleges that he was punched by an officer and that the confession should be tainted because of that. No evidence of such action was ever shown at the hearing, therefore this is without merit.

> The gunshot residue. Mr. Rogers testified that he was lied to in the gunshot residue [sic]. Nowhere in the law is there a requirement that the gunshot residue evidence should have been given to the defendant. If it's exculpatory, certainly it has to be given to the defendant. If it is non-inculpatory, I think there's a finding in the record of it not being used, certainly the defense has an ability to use it. Ms. Dunning was well aware of the gunshot residue, and, therefore, she could have used that had she gone to trial, that there was no gunshot residue or that the gunshot residue was inconclusive.

12

The inculpatory statement I've ruled on. The Court finds that the inculpatory statements were admissible based on the viewing of the statements alone.

Let's talk about the manslaughter plea that was signed. Ms. Bonin alleges that the manslaughter plea was signed after a discussion between Ms. Dunning and the District Attorney's Office in the presence of Joey. Ms. Dunning and Mr. Vines discussed the plea with Mr. Rogers. I practiced law for thirty-seven years. I have discussed pleas with defendants and the prosecutor from the defense side. I've discussed pleas with the defense attorney and the defendant from the prosecution side. I've even had moments alone with defendants, although I don't like to do that. If the defendant indicates he wants to talk alone to me, I'll talk alone with him. But always I'll ask the defendant afterward with the presence of counsel that I made no promises or inducements in order that he talk to me. No promises or inducements have been shown that Mr. Vines made to Joey in order to obtain the guilty plea. Just because a prosecutor may talk with a defendant, although it's unusual, it's not forbidden if the defendant wants to talk to the prosecutor. There's been no showing that Mr. Rogers did not want to talk to the prosecutor.

Additionally, Ms. Bonin complains on behalf of Mr. Rogers that the manslaughter plea was signed and an 893.3 was invoked. That may be true. Ms. Dunning corroborates that and says that she received the 893.3 notice after the plea was signed. Ms. Dunning indicates, in hindsight, that she probably wouldn't have taken the plea. However, during the plea colloquy I discussed with Mr. Rogers the fact that the minimum sentence would be twenty years and the maximum sentence would be forty years. I asked him if any other promises were made. I asked him if there was any inducements to get him to plead guilty. He didn't say anything. He accepted the guilty plea. I don't know what happened between the time that the 893.3 notice was given to the defendant and the time of the plea and I have no evidence from Ms. Dunning that she did not discuss this and make a decision with Mr. Rogers that he wanted to still take the plea. It was shown that Ms. Dunning said that she probably wouldn't do it again in hindsight, as Monday morning quarterback, but there was no showing that any coercion was made to Mr. Rogers.

Additionally, the Court finds that Mr. Rogers was originally charged with second degree murder. So, therefore, by taking the manslaughter plea, he had a finite period of time which he had to do, which he will have to do, and it took off the life imprisonment with benefit of probation, parole, or suspension of sentence.

Having observed Defendant during the plea hearing and heard the testimony

at the motion to vacate the plea, the district court was within its discretion to deny

the motion. Current counsel notes that the prosecutor invoked La.Code Crim.P. art. 893.3 requiring a twenty-year minimum sentence, after the plea deal was signed. However, as discussed above, the district court addressed this issue in the ruling, noting it discussed fully with Defendant and his plea counsel the effects of the article 893.3 enhancement on his sentence during the pea colloquy. Therefore, we find Defendant has failed to establish that he lacked the mental capacity to understand the plea, or that plea counsel's actions hampered his understanding of the plea.

In his second assignment of error, Defendant argues the sentence is excessive. We will not apply the traditional excessiveness analysis, as the jurisprudence prescribes a unique method of review when a defendant has sought a downward departure from a mandatory minimum sentence. As mentioned earlier, the State invoked La.Code Crim.P. art 893.3, which set a mandatory minimum term of twenty years pursuant to Defendant's guilty plea to manslaughter.

The supreme court has discussed the analysis for downward departure from minimum sentences:

> [I]n [*State v.*] *Johnson*, [96-1263 (La. 6/28/96), 676 So.2d 552], where we set out guidelines for when and under what circumstances courts should exercise their discretion under [*State v.*] *Dorthey* [623 So.2d 1276 (La.1993)] to declare excessive a minimum sentence mandated by the Habitual Offender Law. We held that "[a] court may only depart from the minimum sentence if it finds that there is clear and convincing evidence in the particular case before it which would rebut [the] presumption of constitutionality" and emphasized that "departures downward from the minimum sentence under the Habitual Offender Law should occur only in rare situations." *State v. Johnson*, *supra* at 676, 677. To rebut the presumption that the mandatory minimum sentence is constitutional, the defendant must clearly and convincingly show that:
>
> > [he] is exceptional, which in this context means that because of unusual circumstances this defendant is a victim of the legislature's failure to assign sentences that are meaningfully tailored to the culpability of the offender, the gravity of the offense, and the circumstances of the case.
>
> *Id.* (Citing *State v. Young*, 94-1636 (La.App. 4 Cir. 10/26/95), 663 So.2d 525, 529 (Plotkin, J., concurring)).

*State v. Lindsey*, 99-3256, 99-3302, pp. 4-5 (La. 10/17/00), 770 So.2d 339, 343, *cert. denied*, 532 U.S. 1010, 121 S.Ct. 1739 (2001).

The district court denied relief, first because it considered the sentence to be an agreed-upon sentence as part of the plea bargain which acknowledged the mandatory minimum imposed by La.Code Crim.P. art. 893.3. The court's second reason was because it did not think the facts of this particular case justified a downward departure. In reaching this conclusion, the court acknowledged Defendant's low IQ and family dysfunction, but also noted the seriousness of the crime, as Defendant shot a man to death.

Defendant's counsel for sentencing was the same attorney who represented him at the motion to vacate the plea. At the sentencing hearing, counsel produced witnesses but continued to pursue issues related to Defendant's culpability and the admissibility of the confession. As the State pointed out, Defendant's counsel presented no mitigating evidence at the sentencing hearing. Thus, Defendant has failed to demonstrate that he is exceptional within the meaning of *Lindsey*, 770 So.2d 334 and *Young*, 663 So.2d 525. Therefore, this assignment of error lacks merit.

## DECREE

For the foregoing reasons, Defendant, Joey Rogers' guilty plea and sentence are affirmed.

**AFFIRMED.**